# STATE OF LOUISIANA

# COURT OF APPEAL

# FIRST CIRCUIT

# NUMBER 2022 CJ 0927

## STATE OF LOUISIANA IN THE INTEREST OF
## I.K., L.R., M.R., N.R., AND Z.R.

Judgment Rendered: _____DEC 2 2 2022_____

Appealed from the
Thirty-Second Judicial District Court
Parish of Terrebonne
State of Louisiana
Docket Number MSJ 6552

The Honorable Juan W. Pickett, Judge Presiding

\*\*\*\*\*\*\*\*\*\*\*\*\*

| | |
|---|---|
| Wilbert Billiot<br>Houma, LA<br>Jane Hogan<br>Hammond, LA | Counsel for Defendant/Appellant,<br>J.R. |
| Mary R. Mustaller McMillan<br>New Orleans, LA | Counsel for Appellees,<br>L.R., M.R., N.R., and Z.R. |
| Linda A. Mitchell<br>Kimberly R. Calais<br>Houma, LA | Counsel for Appellees,<br>Department of Children and<br>Family Services |
| Joseph L. Waitz, Jr.<br>District Attorney<br>Ellen Doskey<br>Gary Williams, Jr.<br>Assistant District Attorneys<br>Houma, LA | Appellee,<br>The State of Louisiana |
| Kirby Kenny<br>Houma, LA | Counsel for Appellee,<br>Southeast Louisiana Legal Services |
| Jessica L. Duet<br>Houma, LA | Counsel for Appellee,<br>ODPD |

\*\*\*\*\*\*\*\*\*\*\*\*\*

BEFORE: WHIPPLE, C.J., GUIDRY, AND WOLFE, JJ.

**WHIPPLE, C.J.**

This matter is before us on appeal by the father, J.R., from a judgment of the trial court terminating his parental rights and freeing the minor children, L.R., M.R., N.R., and Z. R., for adoption. For the reasons that follow, we vacate and amend the portion of the judgment stating the basis for terminating J.R.'s parental rights and freeing the minor children for adoption, and affirm the judgment of termination, as amended.

## FACTS AND PROCEDURAL HISTORY

This termination of parental rights case began on May 24, 2019, when the Department for Children and Family Services ("the State") initiated an investigation based on a report received the day before of alleged neglect, despondency, and inadequate shelter for I.K., L.R., M.R., N.R., and Z.R.[1] The report alleged that the residence of T.K., the mother, was "deplorable" and "filthy" and that she abused three of the children. The report also alleged that T.K. was unemployed and had received $900.00 in food stamps, but sold half of the food stamps. Upon being invited inside, the reporter, Dominique Wilkerson, observed a disheveled home with several piles of trash on the floor with flies in the living room. There was no food in the refrigerator and very little food in the freezer. T.K. claimed that her children had made a mess earlier in the morning and that she was about to start cleaning up. She also indicated that because she did not have transportation, she and the children would ride public transportation to get food and she could not carry much food home. She further stated that she was supposed to return for work at McDonald's, but was waiting for her re-hire paperwork to be completed. T.K. stated that when she moved into the apartment, it required maintenance, but if she had not taken it, she and the children would have been homeless. At the time of the home visit, the oldest child, I.K., resided with T.K.'s

---

[1] The initials of the children and the parents are used herein to protect the identity of the minor children. See Uniform Rules-Courts of Appeal, Rules 5-1 and 5-2.

2

mother, and his father was unknown. J.R., who was the father of the other children (L.R., M.R., N.R., and Z.R.), was incarcerated for a domestic abuse charge against T.K.

Wilkerson advised T.K. that she had three days to take a drug screening test and one week to obtain adequate food and clean the residence. When Wilkerson returned on May 31, 2019, however, the household was in the same deplorable condition as before. T.K. claimed that L.R., aged four, had been sick all week and she had been transporting him back and forth to Terrebonne General Hospital. When Wilkerson asked to see L.R., she found him lying on the bed in a fetal position, shaking and sweating. T.K. stated he refused to eat or drink. L.R. was then transported to Ochsner, and Wilkerson provided transportation to T.K. to complete her drug screen. When Wilkerson and T.K. entered the parking lot, T.K. began crying and admitted she would fail the drug screen because she used methamphetamines and marijuana.

On June 20, 2019, several Houma police officers and a juvenile detective called the State to report an investigation of domestic violence at T.K.'s home. They reported the house was deplorable, with a bad odor, flies, and no lights, and the children were "filthy." Wilkerson verified the home had no lights, food, or drinking water. T.K. claimed she was "en route" to "get assistance with her light bill" and that her lights had just been turned off that morning. She explained that her ex-boyfriend had broken through her side door and choked her, and that she and the children could not return to the apartment because of the damage. She indicated she did not have support or a place for her and the children to live temporarily. T.K. found assistance at The Haven, where she and the children could stay for one night, but she then called Wilkerson stating she could not give her children what they needed, she could not take care of them, and she did not "want to be with her kids for another 30 minutes."

3

The children were then placed into foster homes, and the State filed for an instanter order seeking to grant custody of I.K., L.R., M.R., N.R., and Z.R. to the State, which the trial court granted on June 21, 2019. On June 25, 2019, the trial court held a 72-hour continued custody hearing at which counsel for both T.K. and J.R. admitted the children were in need of care, but denied all allegations. The trial court found reasonable grounds existed to find the children in need of care and ordered that the children remain in the custody of the State pending further proceedings. The trial court also ordered J.R. to report to the State within 72 hours of his release from jail.

Thereafter, the State filed a petition seeking adjudication of I.K., L.R., M.R., N.R., and Z.R. as children in need of care, alleging that the investigation conducted by Wilkerson showed the allegations of neglect had merit and that the children's best interests would be served by maintaining their custody with the State. Sometime after the trial court's June 25, 2019 hearing and the July 26, 2019 hearing, where the trial court adjudicated the children as being in need of care, J.R. was released from jail.

The State's August 8, 2019 case plan requirements for T.K. and J.R. were to maintain safe and stable housing and ensure the home was free of safety hazards and had working utilities. T.K. and J.R. were required to pay parental contributions toward the cost of care for the children ($10.00 per month per child) while in foster care until they were assessed for child support. They were required to seek employment, attend all visits with the children, and provide information regarding relatives who were interested in becoming caregivers for the children. Their case plans also included completing a mental health and substance abuse assessment, maintaining a safe and stable home, parenting, parental contributions, participating in visits with the children, and drug screens. J.R.'s case plan specifically consisted of maintaining a safe and stable home, drug screens, mental

4

health and substance abuse assessments, parental contributions, parenting, and visitation with his children. At that time, J.R. had not begun addressing his case plan goals.

On December 6, 2019, the trial court held a hearing at which the court found it was in the best interest of I.K. to grant the motion for guardianship to his great-grandmother and to close the case with respect to I.K.

At the June 12, 2020 permanency hearing, the State noted that J.R. had made some progress on his case plan by obtaining employment, visiting with the children, completing parenting and mental health assessments, and was in the process of securing housing, but had not yet secured housing. The trial court found it was in the children's best interests for them to remain in the State's custody, accepted the continued case plan of reunification concurrent with adoption, and granted the State's request for an Adoption and Safe Family Act exception to continue with the case plan.[2]

The trial court held another permanency hearing on September 18, 2020, at which the State noted that J.R. had "made progress" toward his case plan goals by completing the required assessments, but remained unemployed. He had obtained housing, but the State needed to inspect the home, and he still needed to complete anger management and a parenting education class. The trial court granted another Adoption and Safe Family Act exception.

---

[2]Pursuant to the Adoption and Safe Families Act of 1997, states are mandated to establish "permanency plans" for children within the foster care system. The Act provides that such plans must demonstrate, *inter alia,* that the State make reasonable efforts to "preserve and reunify" the family. If such measures fail, the State is mandated to make reasonable efforts to place a child for adoption or with a legal guardian. See State ex rel. J.M., 2002-2089 (La. 1/28/03), 837 So.2d 1247, 1256. The Louisiana Supreme Court has recognized that "[a]lthough our primary goal is to reunite the family, termination is appropriate to free the child for adoption if reunification is not possible. 'Forcing children to remain in foster care indefinitely, when there is no hope of reuniting them with their families, runs afoul of the state and federal mandates to further the best interests of the child.' " State ex rel. J.M., 837 So.2d at 1256-1257; State In the Interest of C.F., 2017-1054 (La. 12/6/17), 235 So. 3d 1066, 1076-1077 (Johnson, C.J., concurring).

At the next permanency hearing on January 8, 2021, the State recommended that the case plan be changed to adoption. T.K. was dealing with pending drug charges. The trial court accepted the case plan for adoption. The next permanency hearing was held on June 15, 2021, where both J.R. and the caseworker for M.R., N.R., and Z.R. testified. The State entered a June 4, 2021 court report. After hearing testimony that J.R. had failed to pay child support and that the State workers knew "more about [his] children" than he did, the trial court ultimately maintained the case plan of adoption.

At the next review hearing on December 7, 2021, the trial court stated it did not "have any evidence at this time, that any of that has changed[,]" and found it was in the best interest of the children, and that reasonable grounds existed, for them **to continue the State's custody and to maintain the plan of adoption,** while noting that J.R. still "has an opportunity to try to turn that around."

On January 25, 2022, the State filed a petition for the termination of parental rights of T.K. and J.R., contending that termination of their parental rights was in the best interest of the children and requesting termination under LSA-Ch.C. art. 1015(5) and (6). Trial was held on April 14 and 28, 2022. J.R., caseworker Asa Douglas, and Z.R.'s foster mother, Charmaine Magee testified at trial. At the conclusion of the trial, the trial court found it was in the best interests of the children to terminate the rights of both T.K. and J.R., noting with regard to J.R. that "although he is coming along recently, there have been—there was a period where there was no substantial, or significant **contact** and **support**[.]" (Emphasis added.) On May 16, 2022, the trial court signed a judgment terminating the parental rights of T.K. and J.R. and freeing the children for adoption. J.R. sought a motion and order for suspensive appeal on May 23, 2022.[3]

___

[3]T.K. did not appeal the termination of her parental rights. Thus, the judgment of termination is final as to her parental rights.

6

## DISCUSSION

On appeal, J.R. contends that the trial court erred in terminating his parental rights because: (1) the State failed to prove grounds of abandonment by clear and convincing evidence, and (2) termination of J.R.'s parental rights was not in the best interest of the children, where the State failed to prove an independent ground for termination.

It is well settled that a trial court's findings on factually intense termination of parental rights issues are reviewed on appeal under a manifest error standard of review. State in Interest of T.L., 2021-0728 (La. App. 1st Cir. 12/22/21), 340 So. 3d 4, 7-8, writ denied, 2022-00170 (La. 3/2/22), 333 So. 3d 827. A reviewing court must accord great deference to the factual findings of the trial court and cannot set aside those findings of fact in the absence of manifest error or unless those findings are clearly wrong. State in Interest of T.L., 340 So. 3d at 8.

In any case to involuntarily terminate parental rights, there are two private interests involved: those of the parents and those of the child. State in Interest of C.J., 2019-1383 (La. App. 1st Cir. 2/21/20), 297 So. 3d 3, 6, writ denied, 2020-00401 (La. 5/1/20), citing State ex rel. J.A., 1999-2905 (La. 1/12/00), 752 So. 2d 806, 810-811. The parents have a natural, fundamental liberty interest to the continuing companionship, care, custody, and management of their children warranting great deference and vigilant protections under the law, and due process requires that a fundamentally fair procedure be followed when the State seeks to terminate the parent-child relationship. State in Interest of C.J., 297 So. 3d at 6. However, the child has a profound interest, often at odds with those of his parents, in terminating parental rights that prevent adoption and inhibit establishing secure, stable, long-term, and continuous relationships in a home with proper parental care. State in Interest of C.J., 297 So. 3d at 6. In balancing those interests, the

7

courts of this state have consistently found the interest of the child to be paramount over that of the parent. State in Interest of C.J., 297 So. 3d at 6.

Title X of the Louisiana Children's Code governs the involuntary termination of parental rights in this state. State in Interest of H.R., 2021-1328 (La. App. 1st Cir. 2/25/22), 341 So. 3d 592, 597. The State's *parens patriae* power allows intervention in the parent-child relationship only under serious circumstances, such as where the State seeks the permanent severance of that relationship in an involuntary termination proceeding. State in Interest of C.J., 297 So. 3d at 6, citing State ex rel. J.A., 752 So. 2d at 811. The purpose of involuntary termination proceedings is "to protect children whose parents are unwilling or unable to provide safety and care adequate to meet their physical, emotional, and mental health needs, by providing a judicial process for the termination of all parental rights and responsibilities and for the certification of the child for adoption." LSA-Ch.C. art. 1001. Courts must proceed with care and caution, as the permanent termination of the legal relationship existing between natural parents and the child is one of the most drastic actions the State can take against its citizens. State in Interest of C.J., 297 So. 3d at 7, citing State ex rel. J.A., 752 So. 2d at 811. Recognizing that the termination of parental rights is a severe and permanent action, the Louisiana Legislature has imposed strict procedural and evidentiary requirements to be met before a judgment of termination can be rendered. State in Interest of T.L., 340 So. 3d at 8.

However, the termination procedure requires the State establish only one ground under LSA-Ch.C. art. 1015 to terminate the parental rights. State in Interest of T.L., 340 So. 3d at 8. The State, as petitioner, bears the burden of establishing each element of a ground for termination of parental rights by clear and convincing evidence. LSA-Ch.C. art. 1035. The trial court must also

8

ultimately find that termination is in the best interest of the child. LSA-Ch.C. art. 1037.

In this matter, the State alleged grounds for termination of J.R.'s parental rights under LSA-Ch.C. art 1015(5) and (6), which provide the following bases for termination of parental rights:

> (5) Abandonment of the child by placing him in the physical custody of a nonparent, or the department, or by otherwise leaving him under circumstances demonstrating an intention to permanently avoid parental responsibility by any of the following:
> (a) For a period of at least four months as of the time of the hearing, despite a diligent search, the whereabouts of the child's parent continue to be unknown.
> (b) As of the time the petition is filed, the parent has failed to provide significant contributions to the child's care and support for any period of six consecutive months.
> (c) As of the time the petition is filed, the parent has failed to maintain significant contact with the child by visiting him or communicating with him for any period of six consecutive months.
> (6) Unless sooner permitted by the court, at least one year has elapsed since a child was removed from the parent's custody pursuant to a court order; there has been no substantial parental compliance with a case plan for services which has been previously filed by the department and approved by the court as necessary for the safe return of the child; and despite earlier intervention, there is no reasonable expectation of significant improvement in the parent's condition or conduct in the near future, considering the child's age and his need for a safe, stable, and permanent home.

On May 16, 2022, the trial court signed a judgment terminating the parental rights of T.K. and J.R. and freeing L.R., M.R., N.R., and Z.R. for adoption, specifically referencing J.R.'s abandonment of his children. Therein, the trial court concluded that the DCFS had proven by clear and convincing evidence that J.R. abandoned his minor children under LSA-Ch.C. art. 1015(5)(c), inasmuch as for a period in excess of six consecutive months he failed to maintain significant contact with his children by visiting or communicating with them.[4]

---

[4]Louisiana Children's Code article 1037 governs the **form** of a termination judgment and sets forth the findings and contents required in a judgment of termination. Pursuant to LSA-Ch.C. art. 1037(B), the trial court is required to enter written findings in the judgment on whether the alleged grounds of LSA-Ch.C. art. 1015 are proven by clear and convincing evidence as required by LSA-Ch.C. art. 1035 and whether termination of parental rights is in the best interest of the children.

After careful review, we find the trial court's ultimate decision to terminate J.R.'s parental rights was correct, albeit on a different basis than that noted in the judgment. Specifically, we find the trial court erred in holding that J.R.'s parental rights should be terminated under LSA-Ch.C. art. 1015(5)(c), where the State failed to prove by clear and convincing evidence that J.R. failed to visit his children "for any period of six consecutive months." Asa Douglas, who became the caseworker in J.R.'s case in July, 2021, testified at the April, 2022 hearing that despite missing the previous month's visit (March 2022), J.R. had been to "every visit" and that his visits have been "straightforward" since she has become case manager. A review of the State's case reports further reflects that although visitations were certainly intermittent and that there were multiple consecutive gaps of as much as 4-5 months at a time between visits, there was no full six-month gap in visitation with L.R., M.R., N.R., and Z.R. The November 27, 2019 report indicated that J.R. had attended three visits since October 1, 2019. The May 28, 2020 report indicated that J.R. visited with the children on February 20, 2020, March 5, 2020, and May 28, 2020. Thereafter, he next visited with the children on either September 23 or 24, 2020, via Zoom. In February, 2021, J.R. visited the children in person and visited them again in April, 2021. He next visited the children in person in August, 2021 and on Zoom in October, 2021. The case plan cover sheet from December 1, 2021 indicated J.R. had attended his scheduled visits during that reporting period.

Thus, on review of the record, we are unable to say that the State met its burden of proving by clear and convincing evidence that J.R. failed to maintain significant **contact** with the children by visiting or communication with them for any period of six **consecutive** months. We therefore conclude the trial court committed manifest error in relying on LSA-Ch.C. art. 1015(5)(c) as a basis for terminating his parental rights.

10

However, as referenced by the trial court in its reasons, in addition to LSA-Ch.C. art. 1015(5)(c), which allows parental rights to be terminated for failure to maintain significant contact with the child by visiting him or communicating with him for any period of six consecutive months, LSA-Ch.C. art. 1015(5)(b) also allows parental rights to be terminated for failure to provide significant contributions to the child's **care** and **support** for any period of six consecutive months.[5]

Although silence in a judgment is generally deemed to be a rejection of that claim or demand before a trial court, the claim or action asserted by the State was that J.R.'s parental rights should be terminated and that such termination was in the best interest of the children. On review, we find no error in the trial court's ultimate ruling that J.R.'s parental rights should be terminated, although not on the basis recited in the judgment under review.

On review, we find the record supports the ultimate judgment of termination of J.R.'s parental rights as the record clearly demonstrates that J.R. failed to comply with LSA-Ch.C. art. 1015(5)(b). Specifically, the record establishes that multiple six-month gaps in J.R.'s financial contributions. L.R., M.R., N.R., and Z.R. entered the State's custody in June, 2019. Thereafter, the State's various documents in J.R.'s case, dated August 8, 2019, November 27, 2019, June 3, 2020,

---

[5]Although the trial court's May 16, 2022 judgment mentioned only the failure to maintain significant contact under LSA-Ch.C. art. 1015(5)(c), at the conclusion of the April, 2022 termination hearings, the trial court based its reasoning for terminating J.R.'s parental rights under **both** LSA-Ch.C. art. 1015(5)(c) and LSA-Ch.C. art. 1015(5)(b), stating as follows:

> Based on the evidence and testimony present in Court [sic], the Court finds that the children have been in custody, for at least a year.
> *     *     *
> And as far as the father's concerned, the Court finds it's in the best interest of the children, and that the evidence was – although he is coming along **recently**, there have been – **there was a period where there was no substantial, or significant contact and support**, so the Court is going to grant the Motion to Terminate – the Petition to Terminate the Parental Rights, and free the children for adoption. [Emphasis added.]

11

September 8, 2020, and December 1, 2021, confirmed that J.R. had not made significant parental contributions.

The State's June 3, 2020 and December 28, 2020 reports indicate that J.R. made some child support payments, which ceased in either March or May, 2020.[6] At the June 15, 2021 permanency hearing, as justification for his failure to provide support, J.R. claimed he had called "the Treasury" about withholding money for his child support payments from his unemployment or income taxes, but, when questioned, admitted he never provided that information to the caseworker. At that time, he was employed by Outback Steakhouse, and he claimed his paychecks were being garnished for child support. However, he presented no evidence to support these assertions or refute the State's showing that he failed to provide financial support for his children. The December 1, 2021 State of Louisiana Case Plan Cover Sheet indicated that J.R. had briefly made payments with Child Support Enforcement from July 2021 through September 2021. At the April, 2022 termination hearings, J.R. claimed that some financial contributions for the children were deducted from his paycheck when he worked at two different restaurants, he also claimed that when he worked at Popeye's during the COVID-19 pandemic, the deductions ceased because it was too complicated to deal with. However, no documentation was presented to corroborate any of these claims or to rebut the State's affirmative showing that he failed to provide financial support for the children.

Instead, the record shows that at the April, 2022 termination hearings, Douglas testified that J.R. last provided financial contributions for the children in September, 2021, and that he was currently unemployed. Douglas stated that he had not made his $10.00 monthly payment to DCFS, but had made one child

---

[6]There is no evidence in the record that establishes any number or amount of payment made by J.R. We also note, the December 28, 2020 report indicates that J.R. had made no financial contributions since March of 2020 in one section of the report and further indicates that he had made no financial contributions since May of 2020 in another section of the report.

12

support payment to Support Enforcement in September 2021. She further testified that J.R. never provided the Department with any documentation of payments to show payments made through Support Enforcement. The only other evidence in the record indicating any financial contribution by J.R. are the State's June 3, 2020 and December 28, 2020 reports, which state that J.R. made some child support payments that ceased in either March or May, 2020, and the December, 2021 report, which states that J.R. had not provided parental contributions, but had made some support payments through Support Enforcement in July through September, 2021.

The record in this case establishes that the children were adjudicated as being in need of care on July 26, 2019. The record further establishes that there was clearly a six-month gap in J.R.'s financial contributions from either March or May, **2020**, through July, **2021**. Although J.R. and Douglas testified he brought snacks and gifts for the children to the visitation meetings, these small offerings do not constitute significant contributions to the children's care and support. See State ex rel. T.P.M., 2006-530 (La. App. 5th Cir. 11/28/06), 947 So. 2d 751, 753-754 (rejecting the natural parents' arguments that bringing toys, snacks, candy, and gifts to their visits with the children constituted significant contributions).

Thus, although the judgment only referenced LSA-Ch.C. art. 1015(5)(c), the State established by clear and convincing evidence that under LSA-Ch.C. art. 1015(5)(b), J.R. failed to provide significant contributions to the children's care and support for multiple periods of six consecutive months warranting the relief sought by the State. Accordingly, to conform to the requirements of the Children's Code, the stated basis in the judgment will be amended to so reflect.

As to whether the State also established that termination of J.R.'s parental rights was in the best interest of the children, we find the trial court did not err in concluding that the State established that it was in the best interest of L.R., M.R.,

13

N.R., and Z.R. to terminate J.R.'s parental rights. As previously noted, although J.R. had sporadic and intermittent visitation which technically met the statutory visitation periods referenced in LSA-Ch.C. art. 1015(5)(c), J.R. showed little or no interest in the children during these occasional visits. At the June 15, 2021 permanency hearing, the State caseworker at the time, Alexis Johnson, testified, "The problem is there is no connection. Like for visits, it is nothing. He will sit there. He will take pictures of them while they are playing. [L.R.] like drags the girls to him—you know, for visits. He don't [sic] interact with them, at all. . . . [A]gain there's no connection there, with them. And it's like, we are kind of forcing him to build a connection with his children[.]"

Similarly, at the April termination hearings, Douglas testified the children do not bond with J.R. during the visits, and only the oldest, L.R., acknowledges him as his father. She further testified that J.R. did not call any of the children for their birthdays, all of which had occurred in the four months preceding the termination hearings, and that although he engaged in multiple weekly phone calls with L.R. at one point, this contact was brief, lasting for only two weeks. Douglas noted that J.R. reached out to Z.R.'s foster parent only once during the 2021 Christmas holidays (which J.R. corroborated by his own admission) and he has never attempted to contact M.R. and N.R.'s foster parents. Douglas stated that she and her supervisor "pleaded" with J.R. at the November, 2021 Family Team Meeting for J.R. to "try to build the bond outside of the Agency," but although "he has had the opportunity to build the bond with his children," he has "refused" to do so.

Z.R.'s foster mother, Charmaine Magee, also testified at one of the termination hearings and stated that she "cornered him" after a court meeting about two years before, because although he had her phone number, he had never contacted her to see or visit his child. After she obtained his phone number, she called him and he answered, but he did not maintain contact with her or Z.R. by

any form of electronic communication. Magee testified that Z.R. has "developed a relationship with the [DCFS] workers, more than she has with dad. And that just kind of baffled me." Since the time Z.R. has been in Magee's care, J.R. has never provided birthday gifts and, in fact, does not even know when her birthday is.

The record further demonstrates J.R.'s lack of interest in awareness of the details of his children's lives, particularly information about their schools and medical problems. At the June 15, 2021 permanency hearing, J.R. indicated he was "unaware" of L.R.'s disabilities, did not know who L.R.'s primary care physician is, and was unaware of all the services L.R. requires.[7] When questioned about the schools the children attend, J.R. admitted he was "not familiar" with what school district the children would be in if he regained custody of them, and did not know what grades the children were in or where they currently attended school or daycare. He candidly admitted he has never participated in any school activities. With regard to J.R.'s interest and involvement in his children's lives, or lack thereof, at the conclusion of the hearing, the trial court commented to J.R. that the children's foster parents "know more about your children than you know about them."

In addition to J.R.'s failure to bond with his children and his lack of basic knowledge about them, the trial court was also aware of J.R.'s previously stated intent to disperse the children to other family members if he regained custody of them. The State's December 28, 2020 report indicated he informed the DCFS that if custody were returned to him, his plan was that he would care for and raise L.R., but he would return M.R. and N.R. to the home of their former foster parents to allow them to raise the children and would place Z.R. in the home of a family member, whose address and contact information he could not provide to the DCFS.

---

[7]L.R. has been diagnosed with encephalitis, major neurocognitive disorder with behavioral disturbance, and attention deficit hyperactivity disorder, and as of the December 7, 2021 review hearing, was also being assessed for autism.

15

The State's June 4, 2021 report likewise indicates that J.R. repeated his intent not to maintain custody of or provide care for the children. He again told the State he intended to give Z.R. to his brother, whose name and contact information he could not provide, and to give the twins to their previous foster parents, from whose home they were removed in 2019, after a report/investigation received by the agency alleging inappropriate behavior of that caretaker's biological son with another child in the home. J.R. also discussed moving to Texas with L.R. when and if the case is closed. Finally, and most troubling in this case, when T.K., the mother, spoke to the State, she indicated that J.R. told her to stay away until he regained custody of the children, and that after the case was closed, he would return the children to her.[8]

At the June 15, 2021 permanency hearing, Johnson testified that J.R. had verbalized on various occasions that he did not intend to maintain custody of the children. She also expressed the State's concern over T.K.'s report that J.R. intended to give the children back to her if he regained custody of them. The State, through Johnson, thus voiced "deep concerns" about his commitment to raising the children. She stated that J.R.'s plan to care for the children was "vague" and that he wanted to give L.R. to his sister and send the other children back to previous caregivers. J.R. also testified at this June 25, 2021 permanency hearing and confirmed his intent not to raise the younger three children himself, stating that he believed sending M.R. and N.R., and Z.R., back to their individual caregivers would help them get "attached" to him.

---

[8]We find the suggestion that J.R. might give the children back to T.K. of particular concern. As noted above, her parental rights have been terminated, and she did not seek an appeal. The record reflects that she failed to complete any aspect of her case plan and failed to maintain safe and stable housing for herself or the children. She last visited with the children via Zoom in May, 2020 and has never made parental contributions. The State does not have any records or progress notes showing she completed classes on substance abuse, mental health, or parenting. The record indicates she became pregnant again during the pendency of this case and admitted to abusing heroin and methamphetamines. At one point, she was also incarcerated on simple burglary charges. Douglas testified that she had spoken with T.K. only once, on February 4, 2022, and T.K. thought her parental rights had already been terminated.

16

At the termination hearing, however, when questioned on these plans, J.R. became evasive and insisted, "if I did, that would be my rights," while also claiming he no longer intended to do so. When asked if he had previously told others he wanted to disperse the children to different family members, he equivocated by answering, "Maybe." J.R.'s testimony about how he currently intends to raise the children was vague, at best, as he claimed he was considering moving either to Texas or Nebraska if he regained custody of the children, but admitted he did not have a definite plan in place as to when he would do so.

At the termination hearings, Douglas expressed deep concern and misgivings about J.R.'s testimony that his family members would help him as he raised the children because none of his family members had ever contacted her, with the exception of a brief exchange with one of J.R.'s cousins, nor had any family member tried to visit with the children since she has been the caseworker. She explained that M.R. and N.R. "don't do well without a familiar contact," and that in the absence of such a person, "they do have some extreme behaviors, that can result in some form of not safety [sic] towards themselves."[9]

The State had further concerns about J.R.'s continued drug abuse over the course of this case. The State's December 28, 2020 report showed that J.R.'s recent hair sample tested positive for amphetamines, methamphetamines, opiates, heroin, and morphine, yet he denied any substance abuse and blamed the test on being around drug abusers. The State referred J.R. for treatment for substance abuse, and although he attended an initial assessment, when the caseworker called him to schedule a follow-up appointment, he reportedly "became very disrespectful" by screaming that he had to work and then hanging up the phone.

---

[9]The record reflects that when M.R. and N.R. entered foster care, they were prone to throwing tantrums and hitting their heads on the floor when they became upset. They also both had the habit of removing their clothes and attempting to eat their feces out of their diapers, as well as sexualized play with dolls, but their foster mother at the time was able to break them of these habits, and through play therapy, these behaviors decreased.

17

He eventually completed the substance abuse class by the time of the State's June 4, 2021 report, but he missed a random drug screening on May 17, 2021, complaining that it was unnecessary as he had just submitted to a drug screening. He later attempted to blame the missed screening on purported issues with his phone. He missed yet another scheduled drug screening on October 26, 2021, claiming he was out of town in Lafayette. Most recently, J.R.'s hair sample from November 24, 2021 had tested positive for amphetamines and methamphetamines. Despite this evidence, at the termination hearings, he repeatedly denied drug use, claiming that either physical contact with a pillow with drugs on it or his fight with someone abusing drugs must have caused the positive result. Douglas's testimony refuted the credibility of J.R.'s explanations. Notably, she testified that the levels of the positive test were "actually pretty high" and that even if he were to come into skin-to-skin contact with a drug user, "there's no way it would be in that level."

Additionally, the record reflects that J.R. never obtained safe and stable housing on his own that is sufficient to meet the needs of the children. J.R. only obtained housing for himself on June 28, 2020, and even by December 28, 2020 the State was unable to complete a home visit because he had tested positive for COVID-19, but never provided documentation of a negative status. Thereafter, the State tried to schedule an assessment but could not do so, because J.R. reported he did not have any days off for the visit. J.R. did not allow the State to complete an inspection of the home until June 10, 2021, claiming he was working on repairs.

At the June 15, 2021 hearing, Johnson testified there were several additional issues with the home that J.R. needed to fix or address. Although J.R. texted Johnson afterwards and stated he had fixed most of them, Douglas confirmed at the April, 2022 termination hearings that J.R. never completed the necessary repairs to the trailer home. Thereafter, the trailer was destroyed by Hurricane Ida. Further,

18

although he owned the trailer, he did not own the property on which the trailer was located, and because he missed payments in September and October, 2021 on the property, he was evicted from that property in October, 2021, and thereafter lived "very transiently" until he received a FEMA trailer. J.R. testified that his current FEMA trailer would be available to him only through January, 2023, but claimed he "should have a spot by then." Douglas understandably expressed concern over J.R.'s housing situation, which would obviously have impacted the children if they were returned to him. In sum, the record does not show that J.R. has ever maintained safe and stable housing, nor has he demonstrated how he will obtain such in the future.

Of further concern to the State was J.R.'s lack of employment. At the termination hearings, J.R. testified he has been unemployed since Hurricane Ida. He stated he cannot work because of a lower back injury he sustained in a garbage truck accident in October, 2021. Although he had recently attempted to work at Big Mike's restaurant, he purportedly could work only four days because of his back. To the extent the J.R. contends that he is disabled and unable to work, we note that a parent alleging lack of employment as just cause for her failure to pay child support must show not only that she was unemployed but that she was unemployable. See State in Interest of T.L., 340 So. 3d at 10-11.

At the termination hearing, Douglas expressed concern over J.R.'s lack of employment, noting that the State was "unaware of how he would be able to support his children." When asked how he would financially support the children if they were returned to him, J.R. claimed he would "put my body at risk ... . You know, I wouldn't mind—you know, going to work and putting everything to the side[,]" but admitted he was not currently employed.

Considering J.R.'s refusal and inability to engage with his children and involve himself in their lives, his intermittent contact with the children, his

19

equivocations about and lack of any realistic plans for raising the children himself, his drug abuse, his failure to obtain safe and stable housing on his own, and his failure to obtain a job to support the children financially, all of which was established by clear and convincing evidence, we find no error in the trial court's conclusion that it was in the best interest of L.R., M.R., N.R, and Z.R. to terminate J.R.'s parental rights.

## CONCLUSION

For the above and foregoing reasons, we find no error by the trial court in concluding that the parental rights of J.R. should be terminated and that L.R., M.R., N.R., and Z.R. are freed for adoption. Accordingly, we affirm this portion of the May 16, 2022 judgment. We hereby vacate the portion of the May 16, 2022 judgment referencing the ground set forth in LSA-Ch.C. art. 1015(5)(c) as a basis for termination; we amend this portion of the May 16, 2022 judgment to reflect that J.R.'s parental rights are terminated pursuant to LSA-Ch.C. art. 1015(5)(b) for his failure to provide significant contributions to the children's care and support for six consecutive months; and we affirm the judgment as amended. We decline to assess costs.

**VACATED IN PART; AMENDED IN PART; AND AFFIRMED, AS AMENDED.**

STATE OF LOUISIANA

COURT OF APPEAL

FIRST CIRCUIT

NUMBER 2022 CJ 0927

STATE OF LOUISIANA IN THE INTEREST OF
I.K., L.R., M.R., N.R., AND Z.R.

GUIDRY, J., dissents and assigns reasons.

GUIDRY, J., dissenting.

I respectfully disagree with the majority's decision affirming the trial court's judgment terminating the parental rights of J.K. but on a basis not addressed by the trial court. Louisiana Children's Code article 1037 governs the form of a termination judgment. Pursuant to La. Ch. C. art. 1037(B), upon finding alleged grounds for termination of parental rights have been proven by clear and convincing evidence and that termination is in the best interest of the child, the trial court shall order the termination of parental rights of the parent against whom the allegations are proven and "shall enter written findings on both issues." In this case, the trial court specifically found and stated in its judgment that "DCFS has proven by clear and convincing evidence that the father, [J.R.] abandoned his minor children pursuant to [La. Ch. C. art.] 1015 (5) (c), inasmuch as for a period in excess of six consecutive months the father failed to maintain significant contact with his children by visiting or communicating with them." The Louisiana Legislature has imposed strict procedural and evidentiary requirements to be met before a judgment of termination can be rendered. State in the Interest of T.L., 21-0728 (La. App. 1st Cir. 12/22/21), 340 So. 3d 4, 8, writ denied, 22-00170 (La. 3/2/22), 333 So. 3d 827. The requirement that the trial court articulate the basis (or bases) for termination in the judgment is such a strict procedural requirement. Accordingly, because the trial court limited its basis for termination of J.R.'s parental rights in the judgment to its

1

finding that the State had proven that J.R. had abandoned his children pursuant to La. Ch. C. art. 1015(5)(c), we are limited to reviewing that basis/finding on appeal. To do otherwise runs afoul of the due process protections afforded to parents, who have a natural, fundamental liberty interest to the continuing companionship, care, custody, and management of their children. See State in Interest of C.J., 19-1383 (La. App. 1st Cir. 2/21/20), 297 So. 3d 3, 6.

In reviewing the trial court's findings, the majority determined that the trial court manifestly erred in relying on La. Ch. C. art. 1015(5)(c) to terminate J.K.'s parental rights, the only basis detailed for termination in the judgment. Accordingly, the judgment should be reversed, and I respectfully disagree with the majority's decision amending the trial court's judgment to reflect that J.R.'s parental rights are terminated pursuant to La. Ch. C. art. 1015(b) for his failure to provide significant contributions to the children's care and support for six consecutive months and affirming the judgment as amended.