# Supreme Court of Louisiana

The Opinions handed down on the **6th day of December, 2017**, are as follows:

**BY GUIDRY, J.**:

2017-CJ-1054    STATE OF LOUISIANA IN THE INTEREST OF C.F. (Parish of St. John)

For the reasons set forth above, we find DCFS met its burden of proving abandonment pursuant to La. Ch. C. art. 1015(4) by clear and convincing evidence. We also find DCFS proved by clear and convincing evidence that the father failed to comply with the case plan pursuant to La Ch. C. art. 1015(5), and that there was no reasonable expectation of significant improvement in the father's condition or conduct in the near future, considering C.F.'s age and her need for a safe, stable and permanent home. The district court manifestly erred in finding otherwise. We further find the record clearly showed that it was in C.F.'s best interest to terminate the father's parental rights, and to allow the child to be free for adoption. The district court was clearly wrong in concluding it was not in C.F.'s best interest. Accordingly, we reverse the district court's judgment and grant DCFS's petition to terminate the father's parental rights. REVERSED.

JOHNSON, C.J., additionally concurs and assigns reasons.
HUGHES, J., dissents with reasons.

SUPREME COURT OF LOUISIANA

No. 2017-CJ-1054

STATE OF LOUISIANA IN THE INTEREST OF C.F.

ON WRIT OF CERTIORARI TO THE COURT OF APPEAL,
FIFTH CIRCUIT, PARISH OF ST. JOHN

**GUIDRY, Justice**

This is a proceeding to terminate parental rights involuntarily. The district court found clear and convincing evidence that supported at least one ground for termination of parental rights, but it nevertheless concluded termination was not in the best interest of the child. For the reasons set forth below, we find the district court was clearly wrong in finding that termination of the father's parental rights was not in the best interest of the child. Accordingly, we reverse the judgment of the district court and render judgment terminating the rights of the father and allowing the child to be adopted.

FACTS AND PROCEDURAL HISTORY

The minor child, C.F., was born on December 22, 2006, to E.F., her mother, and C.F., Jr., her father. The mother died of natural causes on December 30, 2013. On June 9, 2014, the Department of Children and Family Services (hereinafter "DCFS"), received a report expressing concern for the child's welfare, who was living with the father in the child's paternal grandfather's home in Kenner. Upon investigation, DCFS learned that C.F.'s mother was deceased and that C.F.'s father had a lengthy history of substance abuse and was reported to be passed out after smoking crack cocaine in the home while the minor child was in his care. On June 20, 2014, DCFS interviewed the father and reported that his behavior was

1

disoriented and his speech slurred. DCFS reported that, during the interview, the father admitted to smoking crack cocaine ten days earlier while the minor child was asleep in the home. The father thereafter made arrangements for C.F. to stay with his sister. For the following six days, DCFS made several attempts to contact the father to transport him for random urine drug screenings and to refer him for substance abuse treatment. In light of the father's alleged lengthy history of substance abuse and failure to cooperate with DCFS, the trial court granted an oral instanter order directing DCFS to take C.F. into its immediate custody.

On August 12, 2014, the trial court adjudicated C.F. as a child in need of care. The initial case plan goal for permanent placement for C.F. was reunification with a concurrent goal of adoption. The father's case plan required him to find and maintain stable housing for a period of six months; contribute $25.00 per month for C.F.'s care and support; participate in and complete agency-approved substance abuse classes; participate in mental health evaluations and therapy appointments; complete random drug screenings; participate in all court hearings and scheduled Family Team Conferences ("FTCs"); visit with C.F. as scheduled and provide nutritious snacks and age-appropriate toys; and complete agency-approved parenting classes.

On September 10, 2015, DCFS filed a petition to terminate the father's parental rights to C.F. specifying two grounds for termination: (1) abandonment pursuant to La. Ch. Code art. 1015(4),[1] and (2) failure to comply with the case plan

---

[1] La. Ch. Code art. 1015(4), as written in 2015, provided as follows:

> 4) Abandonment of the child by placing him in the physical custody of a nonparent, or the department or by otherwise leaving him under circumstances demonstrating an intention to permanently avoid parental responsibility by any of the following;
>
> \* \* \* \* \*
>
> (b) As of the time the petition is filed, the parent has failed to provide significant contributions to the child's care and support for any period of six consecutive months; ….

pursuant to La. Ch. Code art. 1015(5).[2] With regard to abandonment, DCFS alleged

the father abandoned his daughter by failing to provide any significant contributions

to C.F.'s care and support for a period of six months. With regard to the ground of

failing to comply with the case plan, DCFS alleged the following particulars to

support termination of the father's parental rights:

> 1) The father has failed to consistently attend court-approved scheduled visitations and communicate with the child;
> 2) He has not maintained a safe, stable home;
> 3) He has failed to keep the department apprised of his whereabouts and significant changes affecting his ability to comply with the case plan for services;
> 4) He has repeatedly failed to comply with the required program of treatment and rehabilitation services;
> 5) He lacks substantial improvement in redressing the problems preventing reunification;
> 6) Although the father attended a substance abuse treatment program he continues to have positive test results when screened for drugs; and
> 7) The conditions that led to the removal or similar potentially harmful conditions persist.

On September 29, 2016, the matter proceeded to trial on DCFS's petition to

terminate parental rights. At trial, Kyra Johnson, a child welfare specialist with

DCFS, testified that she is the case worker assigned to C.F.'s case. She testified C.F.

came into state custody on June 26, 2014, and had been placed in a certified foster

home. She testified C.F. was previously placed into state custody in 2007, when her

father admitted to using crack cocaine in C.F.'s presence and her mother, E.F., was

discovered passed out in the home. Within the initial six-month period in the 2007

---

[2] La. Ch. Code art. 1015(5), as written in 2015, provided:

> Unless sooner permitted by the court, at least one year has elapsed since a child was removed from the parent's custody pursuant to a court order; there has been no substantial parental compliance with a case plan for services which has been previously filed by the department and approved by the court as necessary for the safe return of the child; and despite earlier intervention, there is no reasonable expectation of significant improvement in the parent's condition or conduct in the near future, considering the child's age and his need for a safe, stable and permanent home.

case, C.F. was returned to her parents' custody, though the circumstances surrounding the child's return are not contained in the instant record.

As to the father's contributions to the care and support of C.F., Ms. Johnson testified that, at the time of trial, the father had made no payments in accordance with his case plan for C.F.'s support. Instead, the father had provided some snacks during his visits with the child and had provided her with a cell phone.

With regard to compliance with the case plan, Ms. Johnson testified the father received a certificate of completion for the ordered parenting classes and weekly mental health sessions, which included comprehensive evaluations and one-on-one therapy sessions. Ms. Johnson testified the father had completed the required substance abuse program. However, as to satisfying his drug screens, there were some missed screenings, which resulted in automatic positive results pursuant to DCFS procedures, and some positive test results for opiates. Even though the father was warned that a missed drug screen would be deemed a positive outcome, he missed several drug screens prior to December 2015. Ms. Johnson testified the father also tested positive for opiates, but he had indicated to her he had been prescribed pain medication, and on one occasion he did provide proof of such. Ms. Johnson testified the father never tested positive for crack cocaine.

As to the missed screenings and positive test results, Ms. Johnson testified that, after the filing of the September 2015 petition to terminate, the father did not appear for his December 15, 2015 review hearing. At that hearing, the case plan goal was amended to adoption. The father missed his January and February 2016 drug screens. Ms. Johnson testified she observed a noticeable difference in the father's behavior in December 2015, and the beginning of 2016, believing he may have been still grieving the loss of his wife. After the filing of the petition to terminate, the father indicated to Ms. Johnson that he would surrender his rights to C.F. He told

4

her he felt everyone was "turning back on him" and no one was actually trying to help him get his daughter back. The father did appear for the remainder of the monthly drug screens in 2016, up to the date of trial in September 2016.

As to the father's visitation with C.F., Ms. Johnson testified that, prior to December of 2015, the father was scheduled to visit with C.F. twice a month, but that he occasionally missed those visits, often not warning DCFS that he would not be attending the visitation. Ms. Johnson testified that during the visits, the interaction between father and daughter was largely initiated by the daughter. Ms. Johnson testified the father was in an accident in March of 2016, which required him to have multiple surgeries. She testified the father missed his monthly visitations with C.F. from March 2016 through July 2016, but while he may not have been mobile initially, he was likely mobile by June 2016. The father visited with C.F. as scheduled in August and September 2016.

Regarding his income and housing, Ms. Johnson testified the father receives $1,067.00 per month in social security benefits. She testified the father frequently moved around after C.F. entered state custody, living at times with his own father or his son. Most recently, in June 2016, the father leased a 4–bedroom home in Westwego, which provided space for C.F. and appeared operable with working utilities upon inspection. However, Ms. Johnson testified the father's housing was deemed unsuitable by DCFS because he shared his home with his two adult sons and his daughter-in-law, who each have had open foster care cases. She also testified that one son, and possibly the daughter-in-law, were also signatories to the lease.

Ms. Johnson testified C.F. is very happy with her foster care family, who is willing to adopt her. She testified C.F. has stated she does not want to be removed from her foster family and would like to be adopted by them. Ms. Johnson stated that C.F. had never indicated she wanted to return to living with her father, and when

pressed, she would respond that she wanted to stay with her foster family. Ms. Johnson testified C.F. has been diagnosed with depression since June of 2016 at which time she began medication. C.F. is attending trauma therapy as she has suffered extreme distress from the loss of her mother. Ms. Johnson testified that, since June of 2016, C.F. has begun exhibiting improper behavior, has been caught stealing a package from a neighbor's porch, and has been untruthful. C.F. is enrolled in therapy and is receiving support and professional care to address her recent behavioral issues.

The father testified at trial he loves his daughter and he wants her to live with him. He denied continuing to use any illicit drugs and stated he has been sober for approximately a year and a half. He admitted having smoked crack cocaine and that, following the death of his wife, he was in a bad place and went down the wrong path. He stated he is a recovering alcoholic and does not drink alcohol. He testified he is willing to continue substance abuse programs to show he is committed to remaining sober to regain custody of C.F.

The father explained he has been taking prescribed medications for "a long time," since he broke his back when he was approximately twenty years old while working on the river. He testified he never informed his doctors he has had a substance abuse problem with crack cocaine, saying his prior drug use was not related to his prescription for pain medication.

The father testified about his visitations with C.F., explaining that his daughter is suffering from the loss of her mother and has put up an "ice barrier" and that "one visit an hour a day is not even nearly enough to even start breaking through the ice barrier" to communicate with C.F. He admitted he did not visit with C.F. from April to July 2016, explaining he had broken his hip and leg, was immobile for a period of time, and did not want C.F. to see him in that condition. He acknowledged that

6

C.F.'s foster parents are very good people and that he has the "utmost respect" for them and what they have done for C.F. However, he testified he wants to be in C.F.'s life, because he is her father and loves her very much.

With regard to housing, the father testified he resides with his two adult sons, who are C.F.'s siblings, and his daughter-in-law. He believed C.F. would benefit being with him and her siblings who understand her. He explained that he was previously unable to obtain stable housing because he is on a limited income and only began receiving his full social security benefit of $1067.00 per month in July of 2016. He acknowledged that, if he regained custody of C.F., he would receive additional benefits, totaling approximately $402.00 per month, to assist with housing and C.F.'s needs. Although he suggested he would be able to afford to live on his own with C.F., he otherwise indicated that he would continue to reside with his sons, who had lived with him most of their lives and whose assistance he needed. To his knowledge, his sons do not use drugs and he has never seen his sons use drugs in his home. He testified that if his sons began using drugs in the home, he would have to contact the police and remove them from the home. Although he was aware that his sons and daughter-in-law had their own DCFS cases, he was not aware of the details.

The father stated that, if he regained custody of C.F., he would like eventually to move back to Reserve, where C.F. is now living, so that C.F. could maintain contact with her friends and continue with her life there. He testified that his wife had wanted C.F. involved in the church and the community in Reserve and that he would do his best to make that happen. However, he conceded he could not afford to move to Reserve in the immediate future.

As for his failure to appear for drug screenings and to appear at his December 2015 review hearing, the father denied that he refused tests or failed to appear because he was on drugs. He explained he felt there was no need to take the drug

tests and continue with his case plan because he had discussed surrendering his rights with DCFS. The father expressed frustration with the September 2015 filing of the petition to terminate his parental rights so soon after he had completed substance abuse, mental health, and parenting courses. He testified that, at the time, he felt like he could not fight anymore.

After considering the evidence and argument of counsel, the district court denied DCFS's petition to terminate the father's parental rights. The district court first found DCFS had proved by clear and convincing evidence the father had abandoned the child. The court was persuaded by the case worker's testimony that the father never paid any support for the child. The father did not offer any evidence to the contrary, explaining only that his social security benefits had been substantially reduced until recently. The district court found the allegation of abandonment for failure to pay support under La Ch. Code art. 1015(4)(b) was supported by the record.

As to whether the father complied with the case plan, the district court found that, by the time the petition for termination was filed by DCFS in September 2015, the father had complied with the majority of the case plan requirements. The court reasoned that, according to the testimony of the case worker, by June of 2016, the only areas lacking in the father's compliance were housing and financial support. The court noted the father had completed substance abuse treatment, mental health classes, and parenting classes. The district court also cited the case workers' testimony the father had appeared for most of his random drug tests and that the results were mostly negative, with the exception of his testing positive for opiates from prescribed medication and missed screens. The district court also found the father had complied with his visitation schedule, except for the period of March to July of 2016, while the father was recovering from surgery for a hip injury. The

8

district court found that, as of the date of the hearing, the father had secured stable housing for at least three months. The district court found the only issue was the father's failure to pay support. Thus, the court found DCFS had failed to prove the father violated La. Ch. Code art. 1015(5).

Notwithstanding its determination that DCFS had proven by clear and convincing evidence the ground of abandonment for lack of financial support under La. Ch. Code art. 1015(4)(b), the court found termination was not in the best interest of the child. The district court acknowledged the State had presented evidence that C.F. is happy in her current placement, that she does not want to be removed, that she wants to be adopted, and that she has never stated she wants to be returned to her father. The court noted C.F.'s age as nine years old, and acknowledged her wishes, but noted her wishes at this age could not form the basis for termination. The court, nonetheless, acknowledged the child is in a home where all her needs are being met and whose caretaker is interested in adopting her. But, the court noted, there has been no allegation of abuse, despite the concern of DCFS, and nothing inappropriate happened while the child was in her father's care. The court also noted the child's emotional and behavioral issues were likely related to the loss of her mother, suggesting she would require further counseling. Ultimately, the court found "in light of these exceptional circumstances," that DCFS had failed to prove termination was in the child's best interest because "[a]ny other result would be unfair to [the father], who has never been alleged to have abused [C.F.], and to the child herself."

DCFS appealed, and a majority of the court of appeal affirmed. *State in the Interest of C.F.*, 17-24 (La. App. 5 Cir. 5/31/17), ___ So.3d ___. The court of appeal agreed with the district court that DCFS had established by clear and convincing evidence a ground for termination of parental rights, namely abandonment. Nevertheless, the majority found the district court had not manifestly erred in

9

determining that DCFS had failed to establish that termination of parental rights was in the child's best interest. The court of appeal found that the father had complied with his case plan goals to complete substance abuse, mental health, and parenting courses. The court also found the father had consistent visitation with his daughter until his March 2016 accident, bringing the child snacks at each visit and attempting to engage in conversation with her. The court also noted the father's love for his child and his desire to reunite with her.

The court of appeal on the other hand also pointed to evidence supporting termination. The court of appeal noted the father continues to reside in a home with his two adult sons, both of whom have also had open DCFS cases, contrary to the DCFS's case plan requirement to maintain secure and stable housing for C.F. Additionally, the court noted that, although the father has not tested positive for cocaine since C.F. has been in state custody, he has missed numerous drug screenings and on several occasions tested positive for opiates. The court acknowledged the father has a prescription for narcotic pain medication, but it nevertheless noted the father's lengthy use of narcotic medication in addition to the fact that he has not disclosed to his physicians who have prescribed the medication his history of crack cocaine substance abuse. The court reasoned this lack of disclosure could indicate the father continues to suffer from substance abuse issues that may require continued attention and may inhibit his ability to care for C.F. Notwithstanding that concern, the court of appeal majority could not say the district court had manifestly erred in denying DCFS's petition to terminate the father's parental rights, noting the district court did not transfer custody of the child to the father, but instead allowed her to remain in the care of her stable foster family.

We granted DCFS's writ application to review whether the district court manifestly erred in finding that termination of the father's parental rights and

allowing the child to be adopted was not in the best interest of the child. *State in the Interest of C.F.*, 17-1054 (La. 8/30/17), ___ So.3d ___.

LAW AND ANALYSIS

The law on the termination of parental rights is well settled. The termination of parental rights is a two-pronged inquiry. First, the State must prove by clear and convincing evidence the existence of at least one ground for termination under La. Ch. Code art. 1015. La Ch. Code art. 1035(A)("The petitioner bears the burden of establishing each element of a ground for termination of parental rights by clear and convincing evidence."); *Santosky v. Kramer*, 455 U.S. 745 (1982). Only after a ground for termination is found, the trial court must determine whether the termination is in the best interest of the child. La. Ch. Code art. 1039; *State ex rel. L.B. v. G.B.B.*, 02-1715 (La. 12/04/02), 831 So.2d 918, 922. La. Ch. Code art. 1037 provides as follows:

> When the court finds that the alleged grounds set out in any Paragraph of Article 1015 are proven by the evidentiary standards required by Article 1035 and that it is in the best interest of the child, it shall order the termination of the parental rights of the parent against whom the allegations are proven. The court shall enter written findings on both issues. The consideration of best interests of the child shall include consideration of the child's attachment to his current caretakers.

Both lower courts found that DCFS had established grounds for termination of the father's parental rights under La. Ch. Code art. 1015(4)(b) based on his abandonment of his daughter, and the father does not directly contest that determination. DCFS asserts it also established the father failed to substantially comply with the case plan, as required by La. Ch. Code art. 1015(5), and that the district court manifestly erred in finding otherwise. We agree that the record does not support the district court's finding that DCFS failed to establish this ground for termination of parental rights.

11

La. Ch. Code art. 1015(5), relative to failure to complete a case plan goal of reformation within the time limit provides as follows: "Unless sooner permitted by the court, at least one year has elapsed since a child was removed from the parent's custody pursuant to a court order; there has been no substantial parental compliance with a case plan for services which has been previously filed by the department and approved by the court as necessary for the safe return of the child; and despite earlier intervention, there is no reasonable expectation of significant improvement in the parent's condition or conduct in the near future, considering the child's age and his need for a safe, stable and permanent home." The record does not support the district court's finding that the father has substantially complied with his case plan, and it made no specific finding, nor could it on this record, that there was a reasonable expectation of significant improvement in the father's condition or conduct in the near future, considering the child's age and her need for a safe, stable and permanent home.

While the father's participation in treatment and rehabilitation services was established, the court should have focused on whether he exhibited significant improvement in the conditions and conduct that caused the state to remove the child from the father's care and custody. *State in Interest of S.M.*, 98-0922 (La. 10/20/98), 719 So. 2d 445. Lack of parental compliance with a case plan may be evidenced by one or more of the following under La. Ch. Code art. 1036, pertaining to proof of parental misconduct:

> (1) The parent's failure to attend court-approved scheduled visitations with the child.
> (2) The parent's failure to communicate with the child.
> (3) The parent's failure to keep the department apprised of the parent's whereabouts and significant changes affecting the parent's ability to comply with the case plan for services.
> (4) The parent's failure to contribute to the costs of the child's foster care, if ordered to do so by the court when approving the case plan.

(5) The parent's repeated failure to comply with the required program of treatment and rehabilitation services provided in the case plan.
(6) The parent's lack of substantial improvement in redressing the problems preventing reunification.
(7) The persistence of conditions that led to removal or similar potential potentially harmful conditions.

The district court manifestly erred in finding substantial compliance with the case plan, because there is no evidence demonstrating improvement in remedying the problems preventing reunification and the persistence of conditions that led to removal or similar potentially harmful conditions. We agree with DCFS that, despite the father's laudable efforts toward his case plan goals, such as attending the substance abuse, parenting, and mental health sessions, the conditions that led to the removal or similar potentially harmful conditions unfortunately persist, and there is no basis in this record on which to conclude they will significantly improve in the near future.

The case plan required the father to provide a safe and stable home for the child, but there is no evidence that such a home could be provided by the father in the near future. The father was advised that the child could not reside with the father's adult children who had open DCFS cases of their own. At no time, however, did the father obtain safe and stable housing prior to the termination hearing, including at the point that the case plan goal was changed to adoption. The father was required to maintain housing that was safe and appropriate for himself and his child. Since the child's removal in June 2014, the father had been unable to secure such housing. Although the father leased a suitable home some three months prior to the termination hearing, the father's two sons and his daughter-in-law also live in the home, all whom have open foster care cases with DCFS or have had their parental rights terminated. The father was made aware by the case worker that he would not be able to regain custody of his child if he lived with family members who have a

13

history of problems related to child protection. When the father moved into the home, he did not call the case worker to let her know he obtained housing; instead, she found out that he had new housing when she called him to schedule a visit.

The record shows that during the time C.F. has been in foster care, the father lived with his two sons and daughter-in-law in Westwego or Waggaman. Prior to that, he lived with his father in Kenner for four to five months, but he did not explain why he moved from that home. He briefly lived with a female friend for about a week in Metairie. Before that, he lived with his son Christopher and his daughter-in-law Christina in Laplace. However, he and his family members were eventually evicted. Despite being advised that C.F. could not be returned to him if he continued to live with his adult children, he continued to do so. Indeed, he testified that his sons have lived with him most of their lives and that he would continue to allow them to do so, because they were not going anywhere. He also believed the child would benefit being around her brothers. He testified he needs to have his sons live with him in order to be able to afford the housing he had at the time of the hearing; in fact, the case worker testified that one son, and possibly the daughter-in-law, were signatories to the lease. Troublingly, the father, though he claimed to be close to his sons, was unaware of the details or circumstances that led to their being the subject of open DCFS cases. His testimony was contradictory in that, while he claimed he would not live with the sons if the child were returned to him, he also testified that they were not going anywhere and he needed their income to enable him to live in that home. As to the sporadic nature of his housing, the father testified he had lent someone some money that he did not get back, affecting his ability to obtain housing. He also testified that it took him a long time to obtain full social security benefits for himself, another reason for the inability to obtain housing, and that he hoped to get $402 per month more if C.F. were to come back to live with him. Finally, he testified

14

that he hoped to return to live with C.F. in the Reserve area, where she had connections with family, friends, school, and church, but he conceded there was no real prospect for doing so in the immediate future, acknowledging it could be several years before he could do so.

La. Ch. Code art. 1036(D)(3) sets forth what may serve as evidence of a lack of reasonable expectation of significant improvement in the parent's conduct in the near future, namely "Any other condition or conduct that reasonably indicates that the parent is unable or unwilling to provide an adequate permanent home for the child, based upon expert opinion or based upon an established pattern of behavior." Here, there is no reasonable expectation that the father will be able in the near future to provide adequate support for his child or to provide suitable, safe, and stable housing, given the child's age and her need for a safe, stable, and permanent home. Accordingly, we find the district court manifestly erred in finding either that there was substantial compliance by the father with his case plan or, to the extent it considered the matter, that there was any reasonable chance for improvement in the near future.

We further find the district court erred in finding that termination was not in the best interest of C.F. Under La. Ch. Code art. 1001, the purpose of a termination of parental rights proceeding is to protect children whose parents are unwilling or unable to provide safety and care adequate to meet their physical, emotional, and mental health needs. In all proceedings, the primary concern is to secure the best interest of the child if a ground justifying termination of parental rights is proved. Termination of parental rights is to be considered the first step toward permanent placement of the child in a safe and suitable home, and if possible, to achieve the child's adoption.

15

The interests of the parent must be balanced against the child's interest, but the child's interest is paramount. *State ex rel. J.A.*, 752 So.2d at 811. More than simply protecting parental rights, our judicial system must protect the child's right to thrive and survive. *State in Interest of S.M.*, 719 So.2d. at 452. A child has an interest in the termination of rights that prevent adoption and inhibit the child's establishment of secure, stable, long term, continuous family relationships. *Id.* While the interest of a parent is protected in a termination proceeding by enforcing procedural rules enacted to insure that the parental rights are not thoughtlessly severed, those interests must ultimately yield to the paramount interest of the child. *Id.* Children have a right to live in a safe, secure environment and to be reared by someone who is capable of caring for them. *State ex rel. J.M.*, 837 So.2d at 1247.

In our view, the district court focused on the lack of any allegations of abuse by the father and fairness to the father, rather than the best interest of the child. The record evidences the district court was clearly wrong in finding that termination of the father's parental rights was not in the best interest of C.F. C.F.'s caregiver is committed to adopting her, and the caseworker testified it would be in the best interest of the child to be freed for adoption. The child has indicated consistently to the caseworker that she wants to live with the current caretaker and be adopted by her, but has never expressed any desire to live with her father. The father conceded that his daughter is in a safe place and is being well cared for. Although she has experienced some recent behavioral issues, the child is undergoing treatment for trauma over the loss of her mother and for depression. Although the father suggests this depression may be due to loss of his presence in her life, there was no testimony that C.F.'s behavioral issues were due to her father's absence.

The district court noted that it may decline to terminate parental rights in an exceptional case, even after proof of a ground for termination. However, we do not

find the record supports a finding that this case is exceptional. The child is happy in her foster placement, does not want to be placed in another home, and wants to be adopted. As the district court acknowledged, by leaving the child with the current caretaker, the child is in a home where all of her needs are met and whose caretaker is desirous of adopting her. That the child might need additional counseling for the loss of her mother does not support a finding that it is in the child's best interest to not free her for adoption, especially where she is in an adoptive home and does not want to leave. The child's attachment to her current caretaker is a specific consideration in determining the best interests of the child. La. Ch. Code art. 1037(B).

Finally, as we explained earlier, there is no support in this record that the father will be able to provide a safe and stable home for the child in the immediate future. After twenty-seven months of reasonable efforts and services from the state, the record does not support a finding that the father has made substantial improvement in rectifying the problems preventing reunification. Where there is no reasonable expectation of reuniting the child with her parent, allowing the child to remain in foster care indefinitely, as the district court essentially does here, runs afoul of the state and federal mandates to further the best interests of the child. *State ex rel. J.M.,* 02-2089, p. 9 (La. 1/28/03), 837 So.2d 1247, 1257. While adults can take years to improve their functioning, children are not granted the same amount of time, and their lives are significantly disrupted while the parents are attempting to deal with their own problems. *State in the Interest of M.P.*, 538 So.2d 1112 (La. App. 4th Cir. 1989). Accordingly, for these reasons, we find the district court was clearly wrong in determining that termination of the father's parental rights and freeing the child for adoption was not in the best interest of C.F.

CONCLUSION

For the reasons set forth above, we find DCFS met its burden of proving abandonment pursuant to La. Ch. Code art. 1015(4) by clear and convincing evidence. We also find DCFS proved by clear and convincing evidence that the father failed to comply with the case plan pursuant to La Ch. Code art. 1015(5), and that there was no reasonable expectation of significant improvement in the father's condition or conduct in the near future, considering C.F.'s age and her need for a safe, stable, and permanent home. The district court manifestly erred in finding otherwise. We further find the record clearly established that it was in C.F.'s best interest to terminate the father's parental rights, and to allow the child to be free for adoption. The district court was clearly wrong in concluding otherwise. Accordingly, we reverse the district court's judgment and grant DCFS's petition to terminate the father's parental rights.

REVERSED

**SUPREME COURT OF LOUISIANA**

**No. 2017-CJ-1054**

**STATE OF LOUISIANA IN THE INTEREST OF C.F.**

**ON WRIT OF CERTIORARI TO THE COURT OF APPEAL,
FIFTH CIRCUIT, PARISH OF ST. JOHN**

**JOHNSON, Chief Justice, additionally concurs and assigns reasons.**

While I agree in full with the majority opinion, I write separately to emphasize that both the federal government and the State of Louisiana do not intend for children to remain in foster care permanently, and the safety of children is paramount in making decisions about custody. *See* Adoption and Safe Families Act of 1997, 42 U.S.C.A. 601, *et seq*; La. Ch. C. art. 601. Pursuant to the Adoption and Safe Families Act of 1997, states are mandated to establish "permanency plans" for children within the foster care system. The Act provides that such plans must demonstrate, *inter alia*, that the State make reasonable efforts to "preserve and reunify" the family. If such measures fail, the State is mandated to make reasonable efforts to place a child for adoption or with a legal guardian. *See State ex rel. J.M.*, 02-2089 (La. 1/28/03), 837 So. 2d 1247, 1256. This court has recognized that "[a]lthough our primary goal is to reunite the family, termination is appropriate to free the child for adoption if reunification is not possible. 'Forcing children to remain in foster care indefinitely, when there is no hope of reuniting them with their families, runs afoul of the state and federal mandates to further the best interests of the child.'" *Id.* at 1256–57. In this case, C.F. has remained in foster care for more than three years. She is placed in a home where all of her needs are being met. She is placed with caregivers who want to adopt her and she wants to be adopted by them.

1

I agree with the majority that considering the best interests of the child requires this court to terminate C.F. Jr.'s parental rights. While I recognize this father made some efforts toward his case plan goals, those efforts were not sufficient to regain custody of his daughter. The fact remains that there has been no improvement in the father's situation, and the conditions that led to C.F.'s removal persist. Most notable in my view is his failure to provide safe and suitable housing at any point during this case. While the physical condition of the housing he obtained in June of 2016 may be adequate for him, the father's two sons and his daughter-in-law also live in the home, all of whom have open foster care cases or have had their parental rights terminated. This court certainly cannot return custody to the father while he lives in a home with his sons, whose own children cannot safely live with them.

The purpose of a termination of parental rights proceeding is to "protect children whose parents are unwilling or unable to provide safety and care adequate to meet their physical, emotional, and mental health needs, by providing a judicial process for the termination of all parental rights and responsibilities and for the certification of the child for adoption." La. Ch. Code art. 1001. In this case, we do not question the father's love for C.F. We recognize a bond exists between them and that C.F. Jr. desires a continued relationship with his daughter. However, the overriding concern must be the best interests of C.F. The record does not establish that the father's circumstances have materially changed to demonstrate that it would now be in the best interests of C.F. for the father to retain his parental rights. This court cannot ignore the fact that the father has demonstrated an inability to care for his daughter. "Children have the right to live in a safe, secure environment and to be reared by someone who is capable of caring for them." *State ex rel. J.M.*, 837 So. 2d at 1256. In this case, despite his efforts, I find the father is incapable of meeting the needs of his daughter and his parental rights must be terminated.

12/06/17

**SUPREME COURT OF LOUISIANA**

**No. 2017-CJ-1054**

**STATE OF LOUISIANA IN THE INTEREST OF C.F.**

**ON WRIT OF CERTIORARI TO THE COURT OF APPEAL, FIFTH
CIRCUIT, PARISH OF ST. JOHN**

**HUGHES, J.**, dissents with reasons.

Respectfully, I would defer to the judgment of the trial judge, who is in the best position to evaluate these difficult cases.