# STATE OF LOUISIANA
## COURT OF APPEAL, THIRD CIRCUIT

**26-98**

**STATE OF LOUISIANA IN THE INTEREST OF M.H.**

\*\*\*\*\*\*\*\*\*\*

APPEAL FROM THE
FIFTEENTH JUDICIAL DISTRICT COURT
PARISH OF LAFAYETTE, NO. JC-2023-526
HONORABLE THOMAS R. DUPLANTIER, DISTRICT JUDGE

\*\*\*\*\*\*\*\*\*\*

## CHARLES G. FITZGERALD
## JUDGE

\*\*\*\*\*\*\*\*\*\*

Court composed of Elizabeth A. Pickett, Candyce G. Perret, and Charles G. Fitzgerald, Judges.

**AFFIRMED.**

**Corrie R. Gallien**
**Gallien Law, LLC**
**1030 Lafayette Street, Suite 12**
**Lafayette, Louisiana 70501**
**(337) 761-1585**
**Counsel for Defendant/Appellant:**
    **S.T.**

**Lloyd Dangerfield**
**Attorney at Law**
**Post Office Box 91908**
**Lafayette, Louisiana 70509**
**(337) 896-3777**
**Counsel for Defendant/Appellant:**
    **S.T.**

**Diane E. Cote**
**State of Louisiana**
**Department of Children and Family Services**
**825 Kaliste Saloom Road**
**Brandywine III, Suite 150**
**Lafayette, Louisiana 70508**
**(337) 262-5970**
**Counsel for Appellee:**
    **State of Louisiana**
    **Department of Children and Family Services**

**Stephanie R. Reed**
**Acadiana Legal Services Corporation**
**1020 Surrey Street**
**Lafayette, Louisiana 70501**
**(337) 237-4320**
**Counsel for Appellee:**
    **M.H.**

**FITZGERALD, Judge.**

The biological father of M.H., a minor, appeals the trial court judgment terminating his parental rights.[1]

## FACTS AND PROCEDURAL HISTORY

M.H. was born on May 5, 2023. S.H. is the mother. S.T. is the father. S.H. and S.T. never married, and their dating relationship with each other ended a few months before M.H. was born.

By instanter order dated May 15, 2023, M.H. was placed in the custody of the State of Louisiana, through the Department of Children and Family Services (DCFS). Several years later, in August 2025, DCFS filed a petition for involuntary termination of the mother and father's parental rights. Here are the relevant allegations of the petition:

5.

The minor child, [M.H.], came into custody of the Department of Children and Family Services on May 12, 2023, on the grounds of neglect, dependency, medical neglect, lack of adequate supervision. At five days old, the newborn was brought to the hospital and was placed into the NICU being tested for infectious diseases and tetanus having been born in the woods. The child was adjudicated a "Child in Need of Care" on August 16, 2023. The minor child has remained in the custody of the Department of Children and Family Services since entering care and residing in St. Mary Parish, Louisiana with certified adoptive foster parents.

. . . .

8.

Pursuant to the provisions of Louisiana Children's Code Article 1015(5), and unless sooner permitted by the Court, the parental rights of the parents, [S.H. and S.T.], should be terminated in that at least one year has elapsed since the child was removed from the parents' custody pursuant to a court order; case plans for services as to the minor child

---

[1] Initials are used throughout this opinion to protect and maintain the privacy of the minor child in accordance with Uniform Rules—Courts of Appeal, Rule 5–2.

were formulated for the mother and father[], but there has been no substantial compliance with the case plan for services . . . [and] there is no reasonable expectation of significant improvement in the parents' condition or conduct in the near future, considering the child's age and need for a safe, stable and permanent home, for the following non-exclusive reasons, to-wit:

(a)     The parents' have repeatedly failed to comply with the required program of treatment and rehabilitation services provided in the case plan.

(b)     The conditions that led to the removal or similar potentially harmful conditions continue to persist.

(c)     As set forth above, the parents' have failed to cooperate in completion of the case plans designated for reunification of the family.

(d)     The parents' conduct reasonably indicates that they are unable or unwilling to provide an adequate permanent safe home for the minor child, based on expert opinion and/or based upon an established pattern of behavior, as indicated above.

(e)     The parents' lack of substantial improvement in redressing the problems preventing reunification.

(f)     The parents suffer from substance abuse issues and/or mental health issues which render them unable and/or incapable of exercising parental responsibilities without exposing the minor child to a substantial risk of serious harm, based upon expert opinion and/or based upon an established pattern of behavior, as indicated above.

The termination hearing was held on November 17, 2025. At the close of evidence, the trial court ruled from the bench, terminating the mother and father's parental rights and certifying M.H. for adoption. The trial court provided oral reasons for its ruling at that time. A final written judgment was then signed by the court later that day. Only the father, S.T., has appealed this judgment.

On appeal, S.T. asserts three assignments of error (emphasis in original):

**I.     The court manifestly erred by finding that S.T. had not substantially complied with his case plan; that DCFS provided reasonable efforts to assist S.T. to complete his case**

2

**plan; and that there was no reasonable expectation of a significant improvement by S.T. in the near future.**

**II. The court manifestly erred by finding that termination of S.T.'s parental rights was in the best interests of M.H.**

**III. The Department failed to consider relative placements of M.H. prior to seeking termination of S.T.'s parental rights.**

## LAW AND ANALYSIS

The involuntary termination of parental rights was at issue in *State in the Interest of C.F.*, 17-1054 (La. 12/6/17), 235 So.3d 1066. There, the Louisiana Supreme Court provided the following statement of law:

> The termination of parental rights is a two-pronged inquiry. First, the State must prove by clear and convincing evidence the existence of at least one ground for termination under La. Ch. Code art. 1015. La. Ch. Code art. 1035(A) ("The petitioner bears the burden of establishing each element of a ground for termination of parental rights by clear and convincing evidence."); *Santosky v. Kramer*, 455 U.S. 745, 102 S.Ct. 1388, 71 L.Ed.2d 599 (1982). Only after a ground for termination is found, the trial court must determine whether the termination is in the best interest of the child. La. Ch. Code art. 1039; *State ex rel. L.B. v. G.B.B.*, 02-1715 (La. 12/4/02), 831 So.2d 918, 922.

*Id.* at 1072.

"Whether termination of parental rights is warranted is a question of fact, and a district court's factual determinations will not be set aside in the absence of manifest error." *State ex rel. H.A.B.*, 10-1111, p. 31 (La. 10/19/10), 49 So.3d 345, 368.

**First Assignment of Error**

S.T. initially asserts that the trial court manifestly erred by finding that he failed to substantially comply with his case plan and by finding that there was no reasonable expectation of significant improvement in his condition or conduct in the near future.

3

Louisiana Children's Code Article 1015 provides the grounds for the involuntary termination of parental rights. In the case before us, DCFS sought termination of S.T.'s parental rights under paragraph 5 of Article 1015, which states:

> (5) Unless sooner permitted by the court, at least one year has elapsed since a child was removed from the parent's custody pursuant to a court order; there has been no substantial parental compliance with a case plan for services which has been previously filed by the department and approved by the court as necessary for the safe return of the child; and despite earlier intervention, there is no reasonable expectation of significant improvement in the parent's condition or conduct in the near future, considering the child's age and his need for a safe, stable, and permanent home.

Under La.Ch.Code art. 1015(5), DCFS had the burden of proving three elements by clear and convincing evidence: (1) that at least one year had elapsed since M.H. was removed from S.T.'s custody, (2) that S.T. had failed to substantially comply with his case plan, and (3) that there was no reasonable expectation of significant improvement in S.T.'s condition or conduct in the near future. *State ex rel. H.A.B.*, 49 So.3d 345.

As to the first element, the record shows that on May 15, 2023, the trial court signed an instanter order for removal of M.H. and provisional custody to DCFS. More than two years later, on November 17, 2025, S.T.'s parental rights were terminated by the trial court. The first element is thus satisfied.

As to the second element, La.Ch.Code art. 1036(C) provides an illustrative list of relevant evidence, stating in pertinent part: "In accordance with Article 1015(5), lack of parental compliance with a case plan may be evidenced by one or more of the following: . . . (6) The parent's lack of substantial improvement in redressing the problems preventing reunification. (7) The persistence of conditions that led to removal or similar potentially harmful conditions."

Here, DCFS sought termination of S.T.'s parental rights because of the persistence of the conditions that led to removal, as well as the lack of substantial improvement in redressing the problems preventing reunification, particularly S.T.'s inability to provide adequate housing, his unwillingness to provide DCFS with a safety plan addressing mental health issues, and his unwillingness to provide DCFS with requested financial information.

As stated earlier, M.H. was removed and placed in DCFS's custody on May 15, 2023. The initial case plan was accepted by the trial court on October 25, 2023. Thereafter, the trial court approved updated case plans at review hearings on January 24, 2024; May 21, 2024; August 6, 2024; and November 13, 2024. The permanency goal in all these case plans was reunification, and the conditions for reunification remained essentially unchanged.[2]

Thus, from the beginning, the conditions for reunification required that S.T. maintain stable housing with his parents, that he and his family maintain a clean and safe home, that he follow up with mental health support, that he provide proof of mental health stability and continued treatment as required by his provider, that he demonstrate good decision-making skills for the safety and well-being of his daughter, that he complete parent training, and that he pass random drug tests. Then, in the case plan that was approved by the trial court on November 13, 2024, two more conditions were added: first, that S.T. "will provide [DCFS] with proof that he and his family are able to financially provide for [M.H.] and support their household (paystubs, bank statements, SSI documentation)[.]" And second, that he "will

---

[2] The placement plan changed from reunification to adoption in S.T.'s case plan dated October 17, 2024. That case plan was approved by the trial court at the review hearing of January 28, 2025.

provide [DCFS] with a plan for [M.H.] when he begins to hear voices and his anxiety begins to disrupt his thoughts."

Adequate Housing

From the inception of this case, S.T. has been unemployed and has lived with his parents in their house. And during this time, S.T. has been unable to provide a clean and safe home environment for his daughter.

At the termination hearing, Kasha Milstead, who was the DCFS caseworker assigned to the case, described the condition of the home this way: "Basically hoarding, just items all throughout the home, just stuff everywhere." And when she was asked about "clear passage" to move around inside the home, she explained: "Just narrow paths where you can just maneuver your way through, but just things everywhere, it's all over, even outside, on the porch it's full of stuff, under the carport it's full of stuff. It's just a lot, a lot of items."

In conjunction with Ms. Milstead's testimony, numerous photographs of the home, both inside and out, were introduced into evidence. These photographs show that the hoarding situation makes the home unsafe and inadequate for young children like M.H.

In its reasons for judgment, the trial court summed things up this way:

[S.T.'s] parents, I begged them to fix the house to be in a position that they could show the Department that they could provide a safe place for [M.H.]. Since 2023, we have gone back and forth down that road, and it is clear to me they are unable and incapable of providing a home that is safe and free of concerns for a child, even though they know the result of what is going to happen. [S.T.] is incapable on his own of providing housing.

Mental Health Issues

In May 2024, S.T. submitted to a psychological evaluation administered by Dr. Naomi Friedberg. Dr. Friedberg's written report was admitted into evidence.

According to the report, S.T.'s "most current diagnoses are Undifferentiated Schizophrenia; Generalized Anxiety Disorder; Major Depressive Disorder, recurrent, moderate; Insomnia, and ADHD, inattentive type."

The report notes that S.T. "admitted to continuing auditory hallucinations, even with medication compliance. He indicated that he has some days, although not often, when it is hard to concentrate due to the voices he hears, and when he gets overwhelmed with anxiety." And even though he was hospitalized three times from June 2022 to April 2023 for inpatient psychiatric treatment, S.T. reported to Dr. Friedberg "that the frequency and intensity of the hallucinatory phenomena is much less now that he is compliant and consistent with proper medications."

Although Dr. Friedberg concluded that S.T. "has the capability to care for his child[,]" she recommended the following:

> Due to his mental health difficulties and the potential severity of symptoms, he will continue to need the commitment of physical and financial support from his family, which he appears to have. He will also need to have a safety plan in place, agreed upon by the family, when he has episodic difficult symptoms.

Based on Dr. Friedberg's report, S.T.'s case plan was updated to add that S.T. "will provide the agency with a plan for [M.H.] when he begins to hear voices and his anxiety begins to disrupt his thoughts." But in the twelve months that followed, Ms. Milstead testified that S.T. failed to provide any safety plan to DCFS.

Proof of Income

Again, the case plan required S.T. to "provide [DCFS] with proof that he and his family are able to financially provide for [M.H.] and support their household (paystubs, bank statements, SSI documentation)[.]"

Ms. Milstead testified that S.T. was unemployed. She also explained that he was not receiving Supplemental Security Income (SSI). Thus, from the start of this case, S.T. has not had any source of income.

Indeed, Dr. Friedberg's evaluation report summarized S.T.'s unemployment situation this way:

> [S.T.] stated that he graduated from Comeaux High School in regular education coursework in 2009, and then completed a 2 year degree as a machine tool technician at SLCC. He said that he could have had a second Bachelor's degree in Math if he had taken one more Math course. [S.T.] reported that he has worked over the past 10 years, for several companies, as a machinist doing valve work, as well as some HVAC work. He has worked in and around the Lafayette area, in Missouri where his grandparents live for a few years, and in Winnfield, LA where his uncle lives for two years. He admitted that he was always "let go" for various reasons, usually related to his developing and worsening psychotic disorder. [S.T.] stated that the auditory hallucinations he kept experiencing made it difficult for him to concentrate and focus on his work tasks. He said that the voices would tell him he "wasn't good enough", he was "a punk", and "to murder people". He indicated that he was always struggling with significant anxiety and depression related to the auditory hallucinations. After recognizing the progressive nature of his mental health condition, and not being able to get his work done at his last job at LSS in 2022, he finally sought mental health treatment at St. Martinville Behavioral Health Clinic. He also applied for Disability benefits in June 2023, and this claim is still pending.

Nonetheless, S.T. failed to provide DCFS with documentation showing that he and his family can financially provide for M.H., including proof of his SSI claim. DCFS repeatedly requested this information, but S.T. simply ignored these requests.

As the trial court put it:

> [S.T.] survives by his parents. His only way that he can survive is with his parents. He lives with his parents and I don't say that not in a mean way or anything else, but because of the limitations, which he has, he must have the support financially and otherwise of his parents. . . . He does not have housing, he does not have employment, whether or not he is going to be entitled to disability at some point in time, I don't know that, but since 2023 he has been unable to show the Court and the Department that.

Based on our review of the record, we conclude that the trial court did not manifestly err in finding that S.T. had not substantially complied with the case plan. Although S.T. did comply with some aspects of the case plan, the record shows that the conditions that led to his daughter's removal have not been remedied.[3]

Now to the third element of La.Ch.Code art. 1015(5)—lack of any reasonable expectation of significant improvement in the parent's condition or conduct in the near future. For this element, La.Ch.Code art. 1036(D) provides the following nonexclusive list of relevant evidence:

> D. In accordance with Article 1015(5), lack of any reasonable expectation of significant improvement in the parent's conduct in the near future may be evidenced by one or more of the following:
>
> > (1) Any physical or mental illness, mental deficiency, substance abuse, or chemical dependency that renders the parent unable or incapable of exercising parental responsibilities without exposing the child to a substantial risk of serious harm, based upon expert opinion or based upon an established pattern of behavior.
> >
> > . . . .
> >
> > (3) Any other condition or conduct that reasonably indicates that the parent is unable or unwilling to provide an adequate permanent home for the child, based upon expert opinion or based upon an established pattern of behavior.

The record here shows that S.T. never obtained adequate housing, never provided DCFS with a safety plan, and never provided DCFS with any income documentation. In our view, not only does the record show a lack of substantial compliance with the case plan, but it also shows an established pattern of behavior

---

[3] On appeal, S.T. argues for the first time that DCFS failed to make reasonable efforts to assist him in complying with his case plan. Two points on this: first, there is no evidence that DCFS was unavailable or refused to make any necessary referrals for services. And second, this issue was not raised by S.T. at trial and thus cannot be asserted now for the first time on appeal.

which reasonably indicates that S.T. is unwilling or unable to provide an adequate permanent home for his daughter.

In addition, S.T.'s significant mental health issues appear to render him incapable of maintaining employment. They also render him incapable of exercising basic parental responsibilities without exposing M.H. to a substantial risk of harm, especially considering his unwillingness to provide DCFS with a safety plan.

The trial court took this into account in its reasons for judgment:

> Clearly, he suffers from mental diagnosis, which limits his ability to clearly care for a child on his own. I don't think -- and I have observed [S.T.] all these years, I've read all the reports, I am of full confidence that he could not care for that child on his own[.]

Put simply, the record supports the trial court's finding that there is no reasonable expectation of significant improvement in S.T.'s condition or conduct in the near future.

To summarize, DCFS had the burden of proving one of the statutory grounds for termination by clear and convincing evidence. Ultimately, the trial court found that the termination ground under La.Ch.Code art. 1015(5) was proven by clear and convincing evidence. The trial court's finding is reasonable based on the record in its entirety—and this means that the finding is not manifestly erroneous.

**Second Assignment of Error**

In S.T.'s second assignment of error, he contends that the trial court manifestly erred by finding that termination of his parental rights was in the best interest of his daughter.

Once a ground for termination is found, the trial court must then determine whether the termination of parental rights is in the best interest of the child. *State in the Interest of C.F.*, 235 So.3d 1066.

In other words, a trial court cannot terminate a parent's parental rights unless it finds that termination is in the best interest of the child. *State in the Interest of D.H.L.*, 08-39 (La.App. 3 Cir. 4/30/08), 981 So.2d 906. And "[t]his analysis requires a balancing of the child's interests and the parent's interests; however, it has been repeatedly held that the interests of the child are paramount to that of the parent." *State in the Interest of G.E.K.*, 14-682, p. 3 (La.App. 3 Cir. 1/14/15), 155 So.3d 713, 716.

The balancing of these interests was addressed in *State in Interest of C.F.*, 235 So.3d 1066. In that case, the Louisiana Supreme Court explained:

> In all proceedings, the primary concern is to secure the best interest of the child if a ground justifying termination of parental rights is proved. Termination of parental rights is to be considered the first step toward permanent placement of the child in a safe and suitable home, and if possible, to achieve the child's adoption.
>
> The interests of the parent must be balanced against the child's interest, but the child's interest is paramount. More than simply protecting parental rights, our judicial system must protect the child's right to thrive and survive. A child has an interest in the termination of rights that prevent adoption and inhibit the child's establishment of secure, stable, long term, continuous family relationships. While the interest of a parent is protected in a termination proceeding by enforcing procedural rules enacted to insure that the parental rights are not thoughtlessly severed, those interests must ultimately yield to the paramount interest of the child. Children have a right to live in a safe, secure environment and to be reared by someone who is capable of caring for them.

*Id*. at 1075 (citations omitted).

In support of this assignment, S.T. argues that he and his family have bonded with M.H. He contends that termination of his rights cannot rest upon circumstances arising solely from poverty or treatable mental health conditions and that the trial court's determination was driven by S.T.'s poverty. Although we agree that

11

termination of parental rights cannot rest upon poverty or treatable mental health issues, that is not the situation that is before us.

S.T. has been diagnosed with serious mental health issues and has failed to offer a safety plan for M.H. in case of a psychotic episode. Although he continues to address his mental health professionally, he admittedly still hears voices and is unable to maintain employment due to these issues.

Further, S.T. is unable to support himself, let alone a minor child. He relies entirely on his parents to provide for his basic necessities of life. He has no house, no working vehicle, and no job. And on top of that, he made no effort to provide DCFS with the requested documentation showing that he and his family can financially provide for M.H. and support their household.

Finally, S.T. and his parents live in a hoarding situation which makes it impossible to provide a clean and safe home for M.H.

By contrast, M.H. has been in the care and custody of her foster parents since May 2023. These foster parents have cared for her many health needs, have provided her with a safe and secure home, and are willing to adopt her.

In sum, the record evidence reasonably supports the trial court's finding that the termination of S.T.'s parental rights is in the best interest of his minor daughter. The trial court's finding is therefore not manifestly erroneous.

**Third Assignment of Error**

In his third and final assignment, S.T. asserts that DCFS failed to consider the placement of M.H. with relatives prior to terminating his parental rights. Specifically, S.T. argues that placement should have been considered with his parents or with his sister. We disagree for two reasons.

12

First, S.T. lived with his parents in their house, and the hoarding situation inside that house made it unsafe for M.H. Thus, placement with the paternal grandparents was not possible.

And second, there is simply no evidence to support this assignment. Importantly, S.T. did not testify at the termination hearing. Neither did S.T.'s parents. In fact, only one witness testified during S.T.'s defense-in-chief, and that witness was S.T.'s sister.

During her direct examination, S.T.'s sister was asked about her willingness to have M.H. placed in her home. Counsel for DCFS objected on relevancy grounds. The trial court sustained the objection, explaining that "this is a [termination of parental rights hearing], not a dispositional hearing, and I don't think it's proper testimony." S.T.'s lawyer then proffered the excluded testimony.

Now on appeal, Uniform Rules—Courts of Appeal, Rule 1–3 provides in part that "[t]he Courts of Appeal shall review issues that were submitted to the trial court and that are contained in specifications or assignments of error[.]" Yet here, we have not been asked to review the trial court's evidentiary ruling. In other words, that ruling is not addressed in S.T.'s specifications or assignments of error, meaning the issue is not properly preserved for appeal. Consequently, there is no evidence from the termination hearing that supports this assignment of error.

## DISPOSITION

For the above reasons, we affirm the trial court judgment terminating the parental rights of the father, S.T., to his minor child, M.H. The costs of this appeal are assessed to S.T.

**AFFIRMED.**