STATE OF LOUISIANA

COURT OF APPEAL

FIRST CIRCUIT

2026 CJ 0068

STATE OF LOUISIANA IN THE INTEREST OF L.S.

Judgment Rendered: **MAY 28 2026**

* * * * *

On Appeal from the
22nd Judicial District Court
In and for the Parish of St. Tammany
State of Louisiana
Case No. JC-0205-2024

Honorable Scott C. Gardner, Judge Presiding

* * * * *

Sandra B. Terrell
Covington, Louisiana

Counsel for Plaintiff-Appellee,
Department of Children and Family
Services

Betsy H. Smith
Mandeville, Louisiana

Counsel for Plaintiff-Appellee,
L.S. (Minor Child)

Jane C. Hogan
Hammond, Louisiana
-and-
Alexis G. McElveen
New Orleans, Louisiana

Counsel for Defendant-Appellant,
K.S. (Mother)

Whitney H. Germany
Covington, Louisiana

Counsel for Defendant-Appellee,
J.F. (Father)

* * * * *

BEFORE: LANIER, WOLFE, AND HESTER, JJ.

**HESTER, J.**

The mother, K.S., appeals the trial court judgment terminating her parental rights as well as the parental rights of the father, J.F.,[1] and freeing the minor child, L.S., for adoption. For the following reasons, we affirm.

## FACTS AND PROCEDURAL HISTORY

On May 20, 2024, the day L.S. was born, the Department of Children and Family Services ("DCFS") received several reports noting concerns for the safety of L.S. DCFS received reports from four individuals that K.S. made statements that she would harm the child, and a report that the day prior, she hit J.F. with her vehicle during a domestic dispute. DCFS also learned that J.F. became combative on the way to the hospital for the birth of L.S. and was pulled over and eventually hospitalized at an unknown psychiatric facility. K.S. reported to DCFS that her argument with J.F. began because of his methamphetamine use.

On May 22, 2024, an order was signed placing L.S. in the provisional custody of the state. On June 17, 2024, the district attorney filed a child in need of care ("CINC") petition, and the matter was set for an adjudication hearing. During a Family Team Meeting with DCFS held on June 10, 2024, a case plan was created setting goals and requirements for K.S. and J.F. In the judgment of disposition signed on August 20, 2024, the trial court approved the case plan and set the matter for a case review. The trial court approved subsequent case plans on November 13, 2024, and April 17, 2025.

On June 17, 2025, DCFS filed a Petition for Termination of Parental Rights under La. Ch. Code art. 1015(4)(b) and (5) contending that K.S. failed to provide significant contributions to the child's care and support since the May 22, 2024 day of removal for a period of more than six months; K.S. had not substantially complied

---

[1] The father, J.F., is currently incarcerated. He did not appeal the termination of his parental rights.

with the court approved case plans; and there is no reasonable expectation of significant improvement in K.S.'s condition in the near future. In the petition, DCFS noted that K.S. has completed some portions of her case plan, but has not exhibited an ability to understand her role in the reasons for L.S.'s removal and does not exhibit an ability to place L.S.'s need for safety and stability ahead of her own.

On October 1, 2025, the petition for termination of parental rights came before the trial court for a hearing. At the conclusion of the hearing, the trial court granted the motion to terminate parental rights under La. Ch. Code art. 1015, freeing L.S. for adoption. On October 3, 2025, the trial court signed a judgment terminating the parental rights of K.S. and J.F. and certifying L.S. for adoption. K.S. appeals, contending that the trial court erred in terminating her parental rights pursuant to non-compliance with her case plan because she substantially complied with her case plan; DCFS failed to make reasonable efforts to achieve reunification; and there was a reasonable probability of continued improvement in the near future. Additionally, K.S. contends that the trial court erred in terminating her parental rights pursuant to abandonment because her failure to pay her parental contribution was the result of poverty.

## LAW AND ANALYSIS

Title X of the Louisiana Children's Code governs the involuntary termination of parental rights. The purpose of an involuntary termination proceeding is "to protect children whose parents are unwilling or unable to provide safety and care adequate to meet their physical, emotional, and mental health needs, by providing a judicial process for the termination of all parental rights and responsibilities and for the certification of the child for adoption." La. Ch. C. art. 1001. The focus of an involuntary termination proceeding is not whether the parent should be deprived of custody, but whether it would be in the best interest of the child for all legal relations with the parents to be terminated. **State in Interest of C.J.**, 2019-1383 (La. App.

3

1st Cir. 2/21/20), 297 So. 3d 3, 7, writ denied, 2020-00401 (La. 05/01/20), 295 So.3d 946.

Louisiana Children's Code article 1015 provides the statutory grounds by which a court may involuntarily terminate the rights of parents. Relevant hereto, Section (4)(b) and Section (5) provide the following grounds for termination:

> (4)(b) Abandonment of the child by placing him in the physical custody of a nonparent, or the department, or by otherwise leaving him under circumstances demonstrating an intention to permanently avoid parental responsibility by any of the following: ... As of the time the petition is filed, the parent has failed to provide significant contributions to the child's care and support for any period of six consecutive months.

> (5) Unless sooner permitted by the court, at least one year has elapsed since a child was removed from the parent's custody pursuant to a court order; there has been no substantial parental compliance with a case plan for services which has been previously filed by the department and approved by the court as necessary for the safe return of the child; and despite earlier intervention, there is no reasonable expectation of significant improvement in the parent's condition or conduct in the near future, considering the child's age and his need for a safe, stable, and permanent home.

In order to terminate a person's parental rights, the court must find the State has established at least one of the statutory grounds contained in Article 1015 by clear and convincing evidence. See La. Ch. C. art. 1035(A); See also **State in Interest of C.F.**, 2017-1054 (La. 12/06/17), 235 So. 3d 1066, 1072. Even upon finding the State has met its evidentiary burden, a court may not terminate parental rights unless it determines that to do so is in the child's best interest. See La. Ch. C. art. 1037(B)(1).

Whether termination of parental rights is warranted is a question of fact, and a trial court's factual determinations will not be set aside in the absence of manifest error. See **State ex rel. K.G.**, 2002-2886, 841 So. 2d 759, 762 (La. 03/18/03). In applying the manifest error standard, an appellate court seeks to determine whether the record reflects that the trial court was clearly wrong. **State ex rel. H.A.B.**, 2010-1111 (La. 10/19/10), 49 So. 3d 345, 368. Under the manifest error standard, the

4

appellate court does not decide whether the factfinder was right or wrong; rather, the appellate court is required to consider the entire record to determine whether a reasonable factual basis exists for the finding, and whether the finding is manifestly erroneous or clearly wrong. **State in Interest of H.R.**, 2021-1328 (La. App. 1st Cir. 02/25/22), 341 So. 3d 592, 598.

During the trial, Memoree Plaisance,[2] the DCFS's foster care caseworker; Sandra Menendez, the Court Appointed Special Advocate ("CASA") volunteer; and K.S. testified. Additionally, the DCFS case plans as well as CASA's report were introduced into evidence.

**Abandonment**

According to Ms. Plaisance, K.S. was given her original case plan on June 14, 2024, where she agreed to contribute $50.00 per month toward the care of L.S. Ms. Plaisance testified that, as of the date of trial, K.S. had made one $50.00 payment in July 2025. K.S. testified that she was only able to make one payment because she had other things to catch up on, like her bills and her car. K.S. generally relied on L.S.'s foster parents to provide the necessary items such as formula, diapers, and wipes for her visits with L.S., and K.S. rarely brought the items herself. With this evidence, DCFS established that K.S. did not make significant contributions to L.S.'s care and support for more than a year. See La. Ch. C. Art. 1015(4)(b). Furthermore, as we will discuss further below, K.S.'s lack of financial contributions to the care of L.S. was not a result of poverty alone, but also stemmed from her choices, priorities, and an unwillingness to consider employment with a more consistent income and reliable hours despite significant effort from both Ms. Plaisance and Ms. Menendez trying to assist K.S. with her finances.

---

[2] Ms. Plaisance knew K.S. before L.S. was born because she is also the caseworker for one of K.S.'s older children, R.S. K.S. has three older children, but currently does not have custody of them. Her oldest child is in the custody of a paternal grandmother, and the second child is in the custody of a paternal aunt. R.S. is in the custody of the same foster parents as L.S.

5

**Compliance with Her Case Plan**

Ms. Plaisance testified about K.S.'s compliance with her case plan. She noted that K.S. has completed some case plan tasks, including complying with drug screens, completing a mental health assessment, and completing parenting education and domestic violence education. She also stated that K.S., through her assistance, acquired public housing in February 2025. However, Ms. Plaisance raised concerns about the safety and stability of the housing for L.S. because there were instances where K.S.'s utilities were shut off, and K.S. had received disconnect notifications. Ms. Plaisance also raised concerns about K.S. maintaining consistent employment and her financial stability. K.S. testified that she earns approximately $400 per week at her current employment as a dancer, but stated that she has work related expenses because she has to have her hair, nails, and lashes done for her work. When Ms. Plaisance asked K.S. why her utilities were being cut off, she told her that sometimes work is slow, and she needs a ride. Ms. Plaisance set up three appointments with the Developmental Disabilities office in Hammond ("OCDD") to accelerate the disability application process to help K.S. maintain a stable income, but K.S. canceled the appointments each time. Ms. Plaisance also referred K.S. to Louisiana Rehabilitation Services to help her with her education and career goals, but K.S. told her that she was not interested. Finally, Ms. Plaisance suggested financial literacy and education programs, and K.S. told her that she knows how to manage her money and did not need help with that. During the trial, K.S. again testified that she knows how to manage her money.

Ms. Plaisance also raised concerns about K.S.'s lack of a support system and interpersonal relationships, as well as who she is choosing to spend time with. Ms. Plaisance's concerns include the domestic violence instances with J.F.; conflicts with her sister, including text messages exchanged making violent threats; and conflicts with her friends, putting sugar in her vehicle's gas tank after a

6

disagreement. Additionally, K.S., came to a visit with L.S. with two black eyes and differing stories about how it happened, and a February 17, 2025 visit ended early because of the inappropriate behavior of K.S. who was screaming while on the phone with J.F. Ms. Plaisance testified that K.S. had a pattern of leaving her older children with other irresponsible individuals.

Ms. Plaisance, who has been working with K.S. for a long time, concluded that she does not believe there is any likelihood of substantial reformation because she has not seen the genuine behavioral changes that are needed.[3] She is also concerned that K.S. does not take accountability for her child being removed or acknowledge how her decision making affects each child's wellbeing, as K.S. said that DCFS removed her child based on "somebody else's lies."

Ms. Menendez concurred with DCFS's recommendation for termination of K.S.'s parental rights for many of the same reasons stated by Ms. Plaisance. She also expressed concerns about K.S. spending money on things that are not a priority and about K.S.'s lack of interaction with L.S. during the visits. Ms. Menendez noted that Ms. Plaisance repeatedly told K.S. that it is not just a matter of checking items off a list, but a matter of changing your behavior.

We commend K.S. for complying with some elements of her case plan. However, after review of the evidence, we find no manifest error in the trial court's conclusion that DCFS proved by clear and convincing evidence that K.S.'s parental rights should be terminated under La. Ch. Code art. 1015(4)(b) abandonment, and section (5) lack of substantial compliance with her case plan. The trial court gave thorough reasons for its decision to terminate the parental rights of K.S., pointing

---

[3] We question the feasibility of K.S.'s current plan for employment and childcare. K.S., who does not have a working vehicle, testified that she plans to drop L.S. at a friend's house and take a Greyhound or Uber to Sulphur and Vinton, which are more than three hours away, to work in clubs located there where she had to be there for 11:15 a.m. and finishes dancing around 3 a.m. and return home by 7 a.m. to pick L.S. up from her friend's home.

out K.S.'s overall lack of accountability for her children not being in her care as well as a lack of awareness for how her decisions affect her children's safety. Also, we find no merit to K.S.'s argument that DCFS did not make reasonable efforts to achieve reunification. Ms. Plaisance helped K.S. acquire public housing, consistently provided transportation for her to visit L.S., and made multiple efforts to provide K.S. with the opportunity to make better parenting and financial choices for her children.

Finally, we find no error in the trial court's determination that the termination of K.S.'s parental rights is in the best interest of L.S. According to Ms. Plaisance and Ms. Menendez, L.S. is doing really well with her foster parents, which is an adoptive placement. She has been with her foster parents since birth and has a secure attachment with them and her sister, R.S. For these reasons, we affirm the October 3, 2025 judgment terminating the parental rights of K.S.

## CONCLUSION

For the foregoing reasons, the judgment of the trial court is affirmed. All costs of this appeal are assessed to K.S.

**AFFIRMED.**

8