# STATE OF LOUISIANA

## COURT OF APPEAL

## FIRST CIRCUIT

## 2026 CJ 0217



## STATE OF LOUISIANA IN THE INTEREST OF J.G.T.

Judgment Rendered: __JUN 16 2026__

\* \* \* \* \*

On Appeal from the
Juvenile Court
In and for the Parish of East Baton Rouge
State of Louisiana
Docket No. 13209

The Honorable Gail Grover, Judge Presiding

\* \* \* \* \*

| | |
|---|---|
| Terynek Grover-McGrew<br>Kimberly Avery<br>Baton Rouge, Louisiana | Counsel for Appellant,<br>Louisiana Department of Children<br>and Family Services |
| Raveen Hills<br>Baton Rouge, Louisiana | Counsel for Appellee,<br>J.G.T. (Child) |
| Shawn Bray<br>Baton Rouge, Louisiana | Counsel for Appellee,<br>J.D.T. (Father) |
| Hillar C. Moore, III<br>District Attorney<br>Baton Rouge, Louisiana | Attorney for Appellee,<br>State of Louisiana |

\* \* \* \* \*

**BEFORE: MILLER, EDWARDS, AND FIELDS, JJ.**

Edwards, J. concurs w/ reasons

**MILLER, J.**

Appellant, the Department of Children and Family Services ("the State"), appeals a judgment denying its "Petition for Termination of Parental Rights" in favor of Appellee, J.D.T. ("the father"), and against the State. For the following reasons, we affirm.

## FACTS AND PROCEDURAL HISTORY

The minor child, J.G.T. ("the child"), entered the State's custody on September 21, 2023, after the State received a report that the child presented at Our Lady of the Lake Hospital due to a fentanyl overdose. The State developed a case plan on October 4, 2023, which was approved by the trial court and finalized on October 13, 2023. The October 4, 2023 case plan set forth basic requirements for the mother, T.L.W. ("the mother"), and the father to achieve the goal of reunifying the child with them. Subsequently, the trial court adjudicated the child in need of care. At a June 17, 2025 case review hearing, the trial court ordered that the child remain in the State's custody with the goal updated to adoption concurrent with reunification. The trial court ordered the parents to comply with the requirements of an updated case plan, finalized on January 17, 2025, which included the same requirements as prior plans. Thereafter, at a permanency hearing, the juvenile court ordered that the child remain in the State's custody with the goal changed to adoption.

On September 8, 2025, the State filed a "Petition for Termination of Parental Rights." The State alleged that the child, born on April 29, 2022, had been in the custody of the State since September 21, 2023 and was placed with a relative. The State sought termination of the mother's and the father's parental rights to the child pursuant to Louisiana Children's Code article 1015(5). As to the father, the State alleged that he had not been able to maintain safe and stable housing nor maintain employment. The State also had concerns about the father's temperament and his

2

ability to manage the child's behaviors as a result of her autism diagnosis. As to the mother, the State alleged that she failed to find and maintain safe and stable housing, maintain employment, or demonstrate her ability to provide a safe and stable environment for the child.

A termination of parental rights hearing was held as to the mother on October 30, 2025. The mother agreed that the allegations in the petition were true, waived her right to a trial, and stipulated to the termination of her parental rights under Louisiana Children's Code article 1015(5). The trial court signed a judgment on November 14, 2025, ordering the termination of the mother's parental rights and that the child would remain in the State's custody with a goal of adoption pursuant to Louisiana Children's Code article 1040.[1]

Additionally, the trial court held a separate termination of parental rights hearing as to the father on October 30, 2025 and November 25, 2025. The trial court signed a judgment on December 4, 2025, denying the State's petition to terminate the father's parental rights and finding that termination was not in the best interest of the child. The trial court ordered that the child was a child in need of care under Louisiana Children's Code article 606(A)(2) as to the father and found that there was a continued need for placement. The State appeals, contending that the trial court erred in finding that terminating the father's parental rights was not in the best interest of the child.

## DISCUSSION

Termination of the legal relationship between natural parents and a child is one of the most drastic actions the State can take against its citizens. State in Interest of A.B., 2023-0655 (La. App. 1st Cir. 1/19/24), 383 So. 3d 933, 939, writ denied, 2024-00221 (La. 3/7/24), 380 So. 3d 552. The potential loss to the parent is grievous,

---

[1] The mother did not appeal the November 14, 2025 judgment that terminated her parental rights. Therefore, that judgment is final. See State in Interest of A.B., 2023-0655 (La. App. 1st Cir. 1/19/24), 383 So. 3d 933, 935 n. 2, writ denied, 2024-00221 (La. 3/7/24), 380 So. 3d 552.

3

perhaps more so than the loss of personal freedom caused by incarceration. State in Interest of S.F., 2023-1269 (La. App. 1st Cir. 4/19/24), 390 So. 3d 363, 374. The interests of the parents and the child must be balanced; however, the paramount consideration is the best interest of the child. State in Interest of C.F., 2017-1054 (La. 12/6/17), 235 So. 3d 1066, 1075. Thus, rather than simply protecting parental rights, our judicial system must protect the rights of the child to thrive and survive in a safe, secure environment and to be reared by someone capable of caring for them. State in Interest of S.F., 390 So. 3d at 374.

Title X of the Louisiana Children's Code governs the involuntary termination of parental rights. State in Interest of R.M., 2025-0622 (La. App. 1st Cir. 11/7/25), 424 So. 3d 841, 844. The purpose of an involuntary termination proceeding is "to protect children whose parents are unwilling or unable to provide safety and care adequate to meet their physical, emotional, and mental health needs, by providing a judicial process for the termination of all parental rights and responsibilities and for the certification of the child for adoption." La. Ch.C. art. 1001. The focus of an involuntary termination proceeding is not whether the parent should be deprived of custody, but whether it would be in the best interest of the child for all legal relations with the parents to be terminated. State in Interest of R.M., 424 So. 3d at 844.

Louisiana Children's Code article 1015 enumerates the grounds for the involuntary termination of parental rights, which must be pled in the petition. See State in Interest of A.B., 383 So. 3d at 939; see also State in Interest of E.R., 2022-0754 (La. App. 4th Cir. 2/7/23), 357 So. 3d 892, 896, writ denied, 2023-00346 (La. 4/12/23), 359 So. 3d 24 (The petition filed by the State must allege at least one of the statutory grounds for involuntary termination of parental rights provided in Article 1015.). The State must prove the elements of at least one of the statutory grounds for termination by clear and convincing evidence. See La. Ch.C. art. 1035(A); State in Interest of S.F., 390 So. 3d at 374. That is, the State must prove

4

that the existence of the ground for termination is highly probable or much more probable than its nonexistence—more than proof by a preponderance of the evidence, but less than proof beyond a reasonable doubt. State in Interest of A.B., 383 So. 3d at 939.

If the court finds that the State has met its burden of proving one of the grounds for termination by clear and convincing evidence, the court must then determine whether termination is in the best interests of the child. La. Ch.C. art. 1039; State in Interest of S.F., 390 So. 3d at 375. Thus, involuntary termination of parental rights provokes a two-pronged inquiry. First, the State must prove by clear and convincing evidence the existence of at least one of the eight statutory grounds for termination under Article 1015. Second, after the ground for termination is found, the court must determine whether the termination is in the child's best interests. La. Ch.C. art. 1039; State in Interest of S.F., 390 So. 3d at 375.

These factually-intense determinations are reviewed on appeal under the manifest error standard. State in Interest of A.D., 2020-1298 (La. App. 1st Cir. 6/4/21), 327 So. 3d 1032, 1034. The issue to be resolved by the reviewing court is not whether the trier of fact was right or wrong, but whether the factfinder's conclusion was a reasonable one. State in Interest of S.F., 390 So. 3d at 375. If the factual findings are reasonable in light of the record reviewed in its entirety, a reviewing court may not reverse even though convinced that had it been sitting as the trier of fact, it would have weighed the evidence differently. Id.

The State sought to terminate the father's parental rights under Article 1015(5). Louisiana Children's Code article 1015(5) provides:

The grounds for termination of parental rights are:

Unless sooner permitted by the court, at least one year has elapsed since a child was removed from the parent's custody pursuant to a court order; there has been no substantial parental compliance with a case plan for services which has been previously filed by the department and approved by the court as necessary for the safe return of the child; and

5

despite earlier intervention, there is no reasonable expectation of significant improvement in the parent's condition or conduct in the near future, considering the child's age and his need for a safe, stable, and permanent home.

Additionally, Louisiana Children's Code article 1036 provides, in pertinent part:

C. In accordance with Article 1015(5), lack of parental compliance with a case plan may be evidenced by one or more of the following:

(1) The parent's failure to attend court-approved scheduled visitations with the child.

(2) The parent's failure to communicate with the child.

(3) The parent's failure to keep the department apprised of the parent's whereabouts and significant changes affecting the parent's ability to comply with the case plan for services.

(4) The parent's failure to contribute to the costs of the child's foster care, if ordered to do so by the court when approving the case plan.

(5) The parent's repeated failure to comply with the required program of treatment and rehabilitation services provided in the case plan.

(6) The parent's lack of substantial improvement in redressing the problems preventing reunification.

(7) The persistence of conditions that led to removal or similar potentially harmful conditions.

(8)(a) The parent's failure to provide a negative test result for all synthetic or other controlled dangerous substances, except for any drug for which the parent has lawfully received a prescription, at the completion of a reasonable case plan.

(b) For purposes of this Article, "controlled dangerous substance" shall have the meaning ascribed in R.S. 40:961.

D. In accordance with Article 1015(5), lack of any reasonable expectation of significant improvement in the parent's conduct in the near future may be evidenced by one or more of the following:

(1) Any physical or mental illness, mental deficiency, substance abuse, or chemical dependency that renders the parent unable or incapable of exercising parental responsibilities without exposing the child to a substantial risk of serious harm, based upon expert opinion or based upon an established pattern of behavior.

(2) A pattern of repeated incarceration of the parent that has rendered the parent unable to care for the immediate and continuing physical or emotional needs of the child for extended periods of time.

6

(3) Any other condition or conduct that reasonably indicates that the parent is unable or unwilling to provide an adequate permanent home for the child, based upon expert opinion or based upon an established pattern of behavior.

The trial court found that the State met its burden of proof under Article 1015(5) because the child had been in the State's custody for the required amount of time; the father had not substantially complied with his portion of the court approved case plan; and the father had been unable to maintain a permanent and safe home where the child could live. However, the trial court also found that the termination of the father's parental rights was not in the child's best interest. Specifically, the trial court stated that there was no evidence indicating that the child was attached to her new foster placement; the father visited the child when given the opportunity (he visited the child about fifty-two times from September 2023 to September 2025); and the child knew who her father was and was erratic when he left after visiting with her.

In its sole assignment of error, the State contends that the trial court erred in finding that the State did not meet its burden of proving that the termination of the father's parental rights as to the child was in the child's best interest. The State argues that since September 2023, which is when the child entered the State's care, the father has been unable to maintain safe and stable housing. The State contends that the father attempted to work with "Fathers on a Mission" to obtain housing, to no avail, and that he is currently renting a room, which was not a suitable place for the child to live. The State further contends that there has been no evidence of the father's income to show he has the financial means to provide for the child and that the father has been unable to maintain stable employment. Additionally, the State asserts that the father has been incarcerated multiple times for domestic violence and that there are concerns regarding his temperament. Further, the State argues that while the child knows who her father is and calls him "Dad," she also refers to her

7

caseworker as "Mom" and has spent more time with her caseworker than with her father.

The father testified at the hearing on the petition to terminate his parental rights. He testified that he never "[saw] a case plan" and that everything he did in an effort to get his daughter back was voluntary. When questioned about housing, he stated that he rents a room for $400.00 per month through a program that helps people who need housing assistance; he shares the room that he rents with another male; and two other men also live in the house. The father explained that he has lived in the house for a month and before that he lived with his cousin for a little more than a month; he was in a recovery house for alcohol addiction for four months; he lived with another cousin for about six months until the roof caved in on them; and he lived with another cousin for about four months. He testified that he went to the recovery house to leave the alcohol behind, he started Alcoholics Anonymous ("AA") in January 2024, and he now has AA mentors. Regarding employment, the father stated that he has not had consistent employment but just started working at Rouses. He stated that prior to his employment with Rouses, he was a cook at the Council on Aging and a cleaner at Unifirst Corporation.

The father testified that he visits the child every other week. He explained that he arranges each visit with the caseworker and takes the bus to see the child. He testified that the child is comfortable around him, she is happy to see him for visits, and he has bought her clothes, diapers, and wipes. He further testified that he is aware that the child has autism. He additionally stated that he meets with "Fathers on a Mission" every other Tuesday to learn parenting skills. The father testified that when the child was born, he was doing great, the child was living with him, and he had a house and a car. However, he further testified that he was arrested in 2023, which led to him spending four months in jail and losing everything, including his house and job. He stated that the child's mother obtained a restraining order against

him and that his alleged violation of the restraining order resulted in his arrest. The father testified that the allegations, which resulted in the restraining order against him, were false and that this is the first time he has been involved in a domestic violence incident. However, when questioned about a prior restraining order against him, he stated that it was from thirty-five years ago and was not relevant. Moreover, the father testified that he needs at least ninety days to get himself together to provide for the child. He stated that things will be different for him in the next 90 days because he has a job and is looking for housing. He testified that he is saving for an apartment and is willing to get a second job.

The child's caseworker, Lexus Butler, testified that she has been the child's caseworker since September 2023, and that the father has maintained communication with her, contacting her almost daily. She stated that the father obtained housing and employment but had an issue with maintaining housing and employment long-term. She stated that he maintained his visits with the child. Butler stated that she worked to maintain a relationship between the father and the child by providing the father bus passes to get to visits and that the father would bring items like diapers, clothes, or toys for the child about every other visit. She testified that the child recognizes her father and calls him "Dad." However, she also stated that the child tells others that she is the child's mother. Further, Butler testified that she was concerned that the father was still unable to take the child due to his living arrangement and that he has never been in a position to take the child during the time she has been in the State's care. She testified that it would not be in the child's best interest to be placed with the father while he is living with roommates. Additionally, when asked whether the father could manage the child's behaviors, Butler replied that the child did not act out while the father was there, so he has not had to manage her behavior. Butler later testified that the child recently had a tantrum while the father was present and his response was "confused."

9

Butler also testified that the child was diagnosed with autism in June 2025. She stated that the child receives services while in the State's care, including occupational therapy, speech therapy, physical therapy, and Applied Behavioral Analysis therapy. She further stated that the child receives occupational therapy because she lost her basic motor skills when she was exposed to fentanyl. Additionally, Butler testified that the child has moved placements several times—once due to the foster family relocating and twice due to her behavior. She also testified that she tried to place the child in the same placement as her siblings but had to go get her the next day due to her behavior. When asked whether telling the child that she could no longer see her father would be in the child's best interest, Butler replied, "No."

Regarding the father, Butler testified that during the first several months after the child entered the State's care, the father had housing and was visiting the child as required by his case plan. Butler stated that she did not remember if he had a job at that time. She testified that the father was no longer a party when the January 17, 2025 case plan was approved. Additionally, she stated that the father joined "Fathers on a Mission" and began attending AA on his own in 2024. During Butler's testimony, several exhibits were admitted into evidence, including the October 4, 2023 case plan, the June 30, 2025 judgment, and the January 17, 2025 case plan.

Cindy Munn, the child's Court Appointed Special Advocate ("CASA") volunteer, testified that she had been the child's CASA volunteer for two years, since the child was six months old. Munn testified that she met the father only two times because he was incarcerated, he was in treatment for alcohol abuse, he had several health issues, and she did not want to meet with him outside of the State's office due to his background. When asked what she meant by the father's background, Munn explained that she felt unsafe around the father because he had four prior restraining orders against him. However, the father denied that he has had multiple restraining

orders against him. Munn testified that the father would see the child once or twice a month, but the visits were not consistent, so it was difficult for her to attend. She testified that the child's tantrums became more intense—she kicks, spits, hits, bites, pushes, slaps, and throws. She stated that the child has not been able to transition well. Munn testified that the child has her own room for the first time at her current foster placement and that when the child has a tantrum, the foster parent sends the child to her room until she calms down. She stated that the child has been living there for four weeks and that the foster mother is able to handle the child because she does not work, she is home full time, and she owns a child care center. Munn testified that CASA recommended that the child be put up for adoption. She stated that there were concerns as to whether the father could manage the child's behavior because he has not been around her when she acts out and she did not think that he could handle the child. She stated that CASA believes that it is not in the child's best interest to remain in the State's care because she needs stability and because her lack of stability causes the child's tantrums to escalate.

The trial court found that the State proved a statutory ground for terminating the father's parental rights. Pursuant to Article 1015(5), the State established that at least one year elapsed since the child was removed from the father's custody pursuant to a court order; the father was not in substantial compliance with his case plan because he did not obtain housing suitable for the child and had issues maintaining employment; and there is no reasonable expectation of significant improvement in the father's conduct in the near future. The father has moved many times, he is unable to obtain safe and secure housing for the child, and he is unable to maintain employment for long enough to provide for the child. Thus, we find that the State proved a statutory ground for termination of parental rights under Article 1015(5).

However, proof of a statutory ground for termination of parental rights under Article 1015 does not give rise to a presumption that termination is in the child's best interests. State in Interest of A.B., 383 So. 3d at 940. The law poses the best interest determination as a separate consideration and envisions examination of any special conditions or exceptional circumstances that may exist. Id. The consideration of best interests of the child shall include consideration of the child's attachment to her current caretakers. La. Ch.C. art. 1037(B)(1). At the time of the hearing, the child had been in her current foster placement for about four weeks. While Munn, the child's CASA volunteer, testified that the child was doing well in that placement, there was no evidence that the child was attached to her current caretakers. Further, the child has a history of changing placements due to her behavior. Additionally, testimony from the father, the caseworker, and the CASA volunteer establish that the father regularly visits the child as allowed by the State. During those visits, the father has given the child toys, clothes, diapers, and wipes. The caseworker testified that the child is always excited to see the father during visits. Further, testimony from the father and the caseworker establish that the father has obtained employment, which is a requirement under his case plan. Recent compliance with a case plan can support a finding that it is in the best interests of the child not to terminate a parent's rights. State in Interest of A.B., 383 So. 3d at 941. Also, on his own accord, the father joined AA and "Fathers on a Mission."

When findings are based on determinations regarding the credibility of witnesses, the manifest error standard demands great deference be given to the trial court's findings. The manifest error standard of review is applied not only due to the trial court's better capacity to evaluate live witnesses, as compared with the appellate court's access to only a cold record, but also upon the proper allocation of trial and appellate functions between the respective courts. Hoskins v. State Through Division of Administration, Office of Community Development, 2018-1089 (La. App. 1st Cir.

12

2/25/19), 273 So. 3d 323, 330-31. Choosing the path forward that satisfies the child's best interest is complicated and consequential. However, after a careful review of the record, we cannot say that the trial court was manifestly erroneous in denying the State's petition to terminate the father's parental rights at this time. See State in Interest of A.B., 383 So. 3d at 942 (This court held that the trial court's finding that termination of the father's parental rights was in the children's best interest was manifestly erroneous, given the father's recent progress in completing his case plan.); see also State in Interest of M.W., 2023-4 (La. App. 5th Cir. 5/23/23), 366 So. 3d 769, 775 (The trial court's finding that termination of the father's parental rights was not in the child's best interest was not manifestly erroneous, even though at the time of trial, the child had been in the custody of the State for twenty-two months, and the father had not made any substantial progress toward completion of his case plans. The father had shown an interest in being a part of the child's life and had visited the child.).

## CONCLUSION

For the above and foregoing reasons, the December 4, 2025 judgment denying the Department of Children and Family Services' "Petition for Termination of Parental Rights" in favor of J.D.T. and against the Department of Children and Family Services is affirmed. All costs of this appeal in the amount of $716.00 are assessed to the Department of Children and Family Services.

**AFFIRMED.**

13

**EDWARDS, J.,** *concurs with the result and assigns additional reasons.*

While I concur with the result reached by the majority, I write separately to express concern regarding the basis upon which the Department of Children and Family Services ("DCFS") sought termination of the father's parental rights and on which the juvenile court found termination warranted under La. Ch.C. art. 1015(5). DCFS filed its "Petition for Termination of Parental Rights" against the father, J.D.T., on September 8, 2025, pursuant to La. Ch.C. art. 1015(5), alleging that he failed to substantially comply with a case plan. However, there is no dispute that after the dismissal of DCFS's claims asserted against J.D.T. in its child in need of care ("CINC") proceedings on December 5, 2023, the father was no longer a party to those proceedings.

Despite this, the juvenile court subsequently required J.D.T. to comply with two components of case plans (maintain housing and employment). The record reflects that J.D.T. voluntarily worked to comply with both DCFS and the juvenile court's orders. Nevertheless, because J.D.T. was not legally obligated to comply with a case plan after his dismissal from the CINC proceedings, I question the propriety of DCFS and the juvenile court's reliance on alleged case plan noncompliance under La. Ch.C. art. 1015(5) as the basis for seeking and finding termination of the father's parental rights warranted with respect to the minor child, J.G.T.