STATE OF LOUISIANA

COURT OF APPEAL

FIRST CIRCUIT

NO. 2026 CJ 0237

STATE OF LOUISIANA IN THE INTEREST OF K.P. AND S.P.

JUDGMENT RENDERED: **JUN 18 2026**

\* \* \* \* \* \*

On Appeal from the 22nd Judicial District Court
In and for the Parish of St. Tammany
State of Louisiana
Docket No. JC-0302-2024 • Division G

Honorable Scott C. Gardner, Judge Presiding

\* \* \* \* \* \*

| | |
|---|---|
| Alexis G. McElveen<br>New Orleans, Louisiana<br>and<br>Jane Hogan<br>Hammond, Louisiana | Counsel for Appellant,<br>Ka.P. – Mother |
| Whitney Germany<br>Covington, Louisiana | Counsel for Appellee,<br>Ke.P. – Father |
| Sandra Baum Terrell<br>Covington, Louisiana | Counsel for Appellee,<br>State of Louisiana Department of Children<br>and Family Services |
| Betsy H. Smith<br>Mandeville, Louisiana | Counsel for Appellee,<br>K.P. and S.P. – Children |

\* \* \* \* \* \*

BEFORE: THERIOT, BALFOUR, AND HAGGERTY[1], JJ.

---

[1] Judge Bryan D. Haggerty serving *pro tempore* by special appointment of the Louisiana Supreme Court.

**BALFOUR, J.**

A mother, Ka.P., appeals a judgment terminating her parental rights and certifying the minor children, K.P. and S.P., for adoption.[2] For the following reasons, we affirm.

## FACTS AND PROCEDURAL HISTORY

K.P., born December 9, 2019, and S.P., born September 26, 2021, entered the State's custody on September 3, 2024, pursuant to an instanter order for removal. According to the affidavit in support of the instanter order the Department of Children and Family Services (DCFS) received a report initiated by the father, Ke.P. on August 19, 2024, of alleged "Neglect/Lack of Adequate Supervision." According to Ke.P., when he returned home after being released from prison, he found piles of trash in the home and stated that the mother, Ka.P. had left the children and had not been seen by anyone in two weeks. At the time, K.P. was five years old and S.P. was three years old. He also suspected that the mother was using narcotics. The children had been in the custody of the State in the past due to both Ke.P. and the mother using narcotics. Ke.P. stated he was not able to care for the children. On September 24, 2024, the District Attorney for the 22nd Judicial District Court filed a child in need of care (CINC) petition, asserting therein "the child[ren] [are] a victim of neglect." The paternal grandparents advised DCFS that they had already been caring for the children for at least two weeks as they located the mother. They agreed to continue custody of K.P. and S.P.

Both parents were absent when the matter came for a case review hearing on April 14, 2025. The custody for K.P. and S.P. was maintained with the State, and the continued placement with their paternal grandparents was still in the best interest of the children. At the disposition hearings on October 14, 2024, November 26,

---

[2] The initials of the child and the parents are used to protect the identity of the minor child. *See* Uniform Rules-Courts of Appeal, Rules 5-1 and 5-2.

2024, January 26, 2025, and April 14, 2025, the trial court ordered that K.P. and S.P. remain in the custody of the State and the court agreed to the goal of reunification. However, eventually the trial court found that DCFS had made reasonable efforts to unify the children with their parents. An initial permanency hearing was set for August 26, 2025. At the permanency hearing, the Case Plan for K.P. and S.P. was changed to adoption.

On October 8, 2025, DCFS filed a petition for termination of parental rights, requesting the parental rights of Ka.P. and Ke.P. be terminated pursuant to La. Ch. C. art. 1015, Sections 4(b) and 5. In the petition, DCFS alleged that neither parent had substantially complied with the court-approved Case Plan for the safe return of their children. Specifically, DCFS alleged that neither parent could provide a safe and stable home for the children; the father was incarcerated again, and could not provide a home for the children; the mother did not have a home that is adequate for the children and at that time resided in a home where she sleeps on the couch – her third residence throughout the life of the case. Neither parent paid parental contributions for the children. Despite her income of $300.00 per week, the Ka.P. did not make any parental contributions. Ka.P. has transportation issues. Ka.P. is participating in Family Preservation Center (FPC), and she has been sober since March 2025. She is addressing other aspects of her Case Plan through FPC. Ke.P. has been incarcerated for most of the life of this case and he has not complied with any of the action steps on his Case Plans for reunification. DCFS alleged the parents exhibit a repeated pattern of substance abuse and instability that puts their children at risk.

Ka.P. has been involved with DCFS on at least three occasions. She does not have custody of any of her children.[3] K.P. has been in DCFS custody on two

_____

[3] Ka.P. lost custody of B.S., born on March 14, 2020. In that case, the father has custody.

3

occasions. On the first occasion, guardianship of K.P and S.P. was granted to the maternal grandmother, who later returned him to Ka.P. without notifying DCFS. K.P. was diagnosed with Autism Spectrum Disorder, which is being addressed by the paternal grandparents and the school system. S.P. is also likely autistic but there has been no formal diagnosis. Both children had significant developmental delays. The paternal grandmother, M.P., takes them to their numerous appointments. The children were found to be thriving with their paternal grandparents, and DCFS concluded that the children would suffer greatly if returned to the parents. The paternal grandparents wish to adopt them.

On November 19, 2025, Ka.P. filed "A Motion To Set Special Review" asking the court to change the goal from adoption to reunification, and asked for an extension of time pursuant to the "Adoption and Safe Families Act." *See* 42 U.S.C.A. § 601, et seq.; La. Ch. C. art. 60. In support of her request, Ka.P. stated that part of the goal change to adoption was her inability to obtain a driver's license which was remedied when she was able to obtain one in November 2025. She further asserted that she has been substantially compliant with the Case Plan and has made significant improvements in her conduct. The court ordered the parties to show cause as to why the goal should be changed to reunification and set that hearing for December 10, 2025. On December 4, 2025, the Court Appointed Special Advocate (CASA) submitted a report recommending the parental rights be terminated. The trial court held a hearing on the petition for termination of parental rights and Ka.P.'s motion for special review on December 10, 2025. At the conclusion of the hearing, the trial court granted the motion to terminate parental rights, freeing K.P. and S.P for adoption. On December 15, 2025, the trial court signed a judgment terminating the parental rights with both Ka.P. and Ke.P. and certifying K.P. and S.P. for adoption.

4

Only the mother, Ka.P., appeals the December 10, 2025 judgment, arguing the trial court erred: in terminating her parental rights due to non-compliance of her Case Plan; in finding that DCFS made reasonable efforts to achieve reunification; and in finding there was no reasonable probability of continued improvement in the near future. Ka.P. also avers the trial court erred in terminating her parental rights pursuant to her failure to pay parental contributions.

## LAW AND DISCUSSION

Title X of the Louisiana Children's Code governs the involuntary termination of parental rights. The purpose of an involuntary termination proceeding is "to protect children whose parents are unwilling or unable to provide safety and care adequate to meet their physical, emotional, and mental health needs, by providing a judicial process for the termination of all parental rights and responsibilities and for the certification of the child for adoption." La. Ch. C. art. 1001. The focus of an involuntary termination proceeding is not whether the parent should be deprived of custody, but whether it would be in the best interest of the child for all legal relations with the parents to be terminated. *State in Int. of C.J.*, 2019-1383 (La. App. 1 Cir. 02/21/20), 297 So. 3d 3, 7.

Louisiana Children's Code article 1015 provides the statutory grounds by which a court may involuntarily terminate the rights of parents. Here, the specific grounds for the termination of parental rights included La. Ch. C. art. 1015(4)(b) and (5) which states:

\*\*\*

(4) Abandonment of the child by placing him in the physical custody of a nonparent, or the department, or by otherwise leaving him under circumstances demonstrating an intention to permanently avoid parental responsibility by any of the following:

(b) As of the time the petition is filed, the parent has failed to provide significant contributions to the child's care and support for any period of six consecutive months.

5

(5) Unless sooner permitted by the court, at least one year has elapsed since a child was removed from the parent's custody pursuant to a court order; there has been no substantial parental compliance with a case plan for services which has been previously filed by the department and approved by the court as necessary for the safe return of the child; and despite earlier intervention, there is no reasonable expectation of significant improvement in the parent's condition or conduct in the near future, considering the child's age and his need for a safe, stable, and permanent home.

In order to terminate a person's parental rights, the court must find the State has established at least one of the statutory grounds contained in Article 1015 by clear and convincing evidence. *See* La. Ch. C. art. 1035(A); *See also State in Int. of C.F.*, 2017-1054 (La. 12/06/17), 235 So. 3d 1066, 1072. Even upon finding the State has met its evidentiary burden, a court may not terminate parental rights unless it determines that to do so is in the child's best interest. *See State in Int. of S.F.*, 2023-1269 (La. App. 1 Cir. 04/19/24), 390 So 3d 363, 375. *See also* La. Ch. C. art. 1037(B). Whether termination of parental rights is warranted is a question of fact, and a district court's factual determinations will not be set aside in the absence of manifest error. *State ex rel. K.G.*, 2002-2886 (La. 03/18/03), 841 So. 2d 759, 762. In applying the manifest error standard, an appellate court seeks to determine whether the record reflects the district court was clearly wrong. *State ex rel. H.A.B.*, 2010-1111 (La. 10/19/10), 49 So. 3d 345, 368. Under the manifest error standard, the appellate court does not decide whether the factfinder was right or wrong; rather, the appellate court is required to consider the entire record to determine whether a reasonable factual basis exists for the finding, and whether the finding is manifestly erroneous or clearly wrong. *State in Interest of H.R.*, 2021-1328 (La. App. 1 Cir. 02/25/22), 341 So. 3d 592, 598.

At the termination hearing, Melinda Owenwald-Dumaine testified that she was the original case manager through September 2025. She testified that many referrals she gave to the parents were not followed up. She confirmed that Ka.P.'s living situation was unstable. She confirmed a conversation with Ka.P. about her

6

fiancé being a criminal and that her Case Plan did not allow her to associate with a person with a known criminal background. And that Ka.P. planned to move forward with her fiancé in her life. Ka.P. also agreed that there were no parent contributions for either child. Ms. Owenwald-Dumaine confirmed that Ka.P. completed parenting classes and that Ka.P. had been sober since March 2025. She observed interaction between Ka.P. and her children and felt that there needed to be more interaction. Ms. Owenwald-Dumaine confirmed that despite some progress she still recommended adoption and explained:

> The overall instability is the main factor where she has maintained sobriety now for several months. There has just been such a long history leading up to now of substance abuse, unstable living conditions, lack of job and economic support for her family, and I just – [DCFS'] position at the time is it just has not been a long enough sustained proven amount of time of stability to overcome.

Ms. Owenwald-Dumaine further explained, "the clock started in September of 2024 and nothing was done for months and months and months. . . . [T]o drag this out even longer when they are in -- finally in the only stable home . . . would be a disservice to these children."

M.P. explained her and her husband were the caretakers for K.P. and S.P. She described that when the children came to them, the children were filthy and not potty trained. Neither would say any words, and just make sounds. She had to purchase the children shoes. K.P. had major dental and medical issues. Both children had several appointments including eye doctor, ENT, autism specialists, and speech therapists. In general, both children require a lot of supervision and Ka.P. cannot discipline the boys when they have their visits. M.P. would tell Ka.P. about all the appointments and locations, but Ka.P. never inquired, never called, and never attended any of the appointments. M.P. stated that when Ka.P. sends a text message, she always reads it aloud to the children. However, it was noted that Ka.P. did not text to wish her son a happy birthday. M.P. conveyed that she is happy that Ka.P. is

7

sober, but neither she nor her husband "see progress as far as the relationship with the boys."

Aliesha Simms, the most recent case manager, testified that Ka.P. obtained her driver's license, in November 2025 and she moved into a residence. The residence belongs to her fiancé's mother. At one point the house had around 20 cats, but that had been reduced. Her fiancé had no relationship with K.P. or S.P. Ms. Simms explained that Ka.P. was not compliant with the Case Plan because she did not have stable housing for a period of six months, associating with individuals with criminal background, and no observable behavior change. Ka.P. did not attend scheduled visits with her children in November or December 2025. Ms. Simms testified that she did not observe a bond between Ka.P. and the children. Faith Stanton, the CASA appointed to the case, prepared a report and testified it was in the best interest of the children to terminate Ka.P.'s parental rights. She witnessed several visitations with the Ka.P. and K.P. and S.P. and stated it was more of a "play date." She also talked to Ka.P. about her fiancé, who is a work release program and was incarcerated for drug use. Ms. Stanton also stated that Ka.P. has a vehicle but shares it with her mother. Ms. Stanton was asked if additional time could establish sufficient stability for Ka.P. and the children. She responded, "… what I've observed so far, no. Those boys need a lot of attention . . . they have to go to their appointments. . . . I don't see how she would be able to bring the kids to school and their appointment - - not at this time." Myoshia Robinson, the family services supervisor for Family Preservation Court (FPC), testified that Ka.P. completed "Phase 3" of the parenting classes.

Ka.P. testified. She confirmed she obtained a driver's license. Her criminal charges have been resolved to three-year probation. She admitted she did not make any parental contribution payments because she was unable to: She had to pay a fine to get her license back, she had a dentist appointment and oral surgery that she had

to pay, payment to get back and forth to her classes, new flooring in her trailer for the boys' room. She and her mother share a vehicle, but she testified she can use it whenever she wants. She explained her fiancé would not move in right away to make sure he stayed sober and avoided criminal activity. When asked why she was still associating with him despite her Case Plan stating she cannot, she responded "That, I don't know." She acknowledged she had a substance abuse problem but she now intends to stay sober. She testified that she learned more about how to be a parent. She further testified that there was a misunderstanding and miscommunication as the reason why she did not make the November visitation. For the December visitation "she had a busy day... and totally forgot about it." She tried to confirm an hour the noon deadline, but it was too late. She explained that she does not like making phone calls and prefers to text when she communicates with K.P. and S.P. She agreed she was not involved with any of the childrens' doctor appointments and that they are doing well now.

In its written reasons signed December 2025, the trial court found that K.P. and S.P. were taken into custody by DCFS and placed with the paternal grandparents where they have remained for more than fourteen months. DCFS was called to take the children into its legal custody to enable the grandparents to take actions on behalf of the children to address their health, education, and legal needs. Previously, the older child, K.P., was subject to at least one other Child In Need of Care (CINC) proceeding as a result of the parents' drug use. Guardianship of K.P. was awarded to his maternal grandmother. Ke.P. has three other children for which he does not have custody. The trial court further noted that when the children first came into custody in the case at bar, they were non-verbal, not potty trained, and appeared to be developmentally delayed. Further, K.P.'s dental hygiene had been neglected and he required several crowns and root canals. Significantly, the trial court took judicial

notice that an older child of Ka.P. was subject to another CINC proceeding wherein she lost custody of that child.

DCFS initially formulated a Case Plan for the parents to enable them to have the children returned to their custody. It included the requirements that each parent provide financial contributions of $25.00 per month per child towards the children's care, complete parenting classes, submit to substance abuse and mental health evaluations and follow through on all of the recommendations for treatment, maintain employment, secure safe and stable housing, reliable transportation, resolve all pending legal matters, attend all court appearances and Family Team Meetings (FTM's), keep in touch with DCFS and visit with children pursuant to the DSFM's schedule. The trial court noted that the parents have failed to comply with all of those requirements. Ke.P. expressed his desire to surrender his parental rights to his father and step-mother. Neither parent made any payments towards their children's care. The trial court noted that both Ka.P. and Ke.P. were incarcerated several times during the pendency of the case.

The trial court noted that at the beginning of the case, Ka.P. was encouraged to seek treatment for her addiction. After six months into the case, she enrolled in the court's Family Preservation Court (FPC) program. The trial court acknowledged that Ka.P. regularly attended FPC hearings as well as treatment, the trial court believed that she failed to satisfy many of the other requirements of her Case Plan and more significantly, demonstrated a lack of concern about her children's welfare. The trial court pointed out that Ka.P. was sleeping on the sofa of a house owned by the mother of her fiancé, whom at the time was incarcerated on drug offenses and scheduled to be released until April 2026. The trial court questioned Ka.P.'s housing stability because of the relationship with her landlord and her fiancé.

The trial court noted that the testimony from the various witnesses was inconsistent as to whether Ka.P. planned to live with her fiancé upon his release.

10

She admitted that she had been told that living with her fiancé was prohibited under her Case Plan due to his criminal conviction. The trial court stated that Ka.P. found employment in May 2025, however, she does not own her own car and shares a car with her mother. Ka.P.'s mother works full time. The trial court questioned Ka.P.'s ability to use the car for her own employment and children's needs.

Finally, the trial court noted that Ka.P. admitted she had not made any payments towards her children's care as she needed the money to post her bond on her criminal charges, resolve her driver's license issues, and install new flooring. With regard to her fiancée, she admitted that she knew he had convictions. She admitted that her children had "problems" and that she could have done better but that she had done the best she could. The trial court specifically stated that the children have special needs and require speech therapy, treatment by an ENT, eye doctors, dentists, oral surgeons, and treatment to address their autism diagnosis; however, Ka.P. did not attend any of the children's numerous medical appointments or school events, nor did she ever called to inquire. In conclusion, according to the trial court, all those who testified stated that there was no reasonable expectation of significant improvement in the parents' condition or conduct in the near future. The trial court found DCFS had met its burden of providing the grounds for the termination, abandonment, failure to provide financial support, and failure to comply with the DCFS's Case Plan pursuant to La. Ch. C. art. 101.5 (4)(b) and (5). As such, the motion for a change from the status of adoption to reunification was rendered moot.

Ka.P. argues that she was in compliance with her Case Plan. While K.P. and S.P. was in the State's custody for over a year, the trial court found that Ka.P. did not comply, we agree. Ka.P. was fully aware of the "action" steps expected of her when the goal was reunification. After having transportation issues, she finally met face to face with Ms. Owenwald-Dumaine in October 2024, to discuss the Case Plan.

11

Case Plans were prepared and finalized September 24, 2023, January 27, 2025, and August 11, 2025 in anticipation of every meeting with DCFS.

As indicated, the Case Plan included at least six months of adequate housing. Ka.P. did not achieve this and the trial court found her most recent housing situation she had for two months, questionable as to its stability, considering it was owned by the mother of her fiancé. Ka.P. admitted she did not contribute to the children's welfare despite having a salary of $300/week beginning in May 2025. Ka.P. chose to advance a relationship, including plans to marry, with someone with a known criminal history. She also admitted that she did not make all of her family team meetings, sometimes due to transportation issues other times due to miscommunication. The record supports the trial court's finding that Ka.P. did not have suitable transportation for the children's school and medical appointments. The trial court acknowledged that she had taken steps to comply with her Case Plan, but not substantially. We find the trial court did not err in finding that Ka.P. did not substantially comply with her Case Plan.

Ka.P. complains that the trial court erred in finding that DCFS made reasonable efforts to achieve reunification. "Reasonable efforts" are defined by La. Ch. C. art. 603(26) as "the exercise of ordinary diligence and care by the department throughout the pendency of a case pursuant to the obligations imposed on the state by federal and state law to provide services and supports designed and intended ... to reunite families after separation, and to achieve safe permanency for children."

Herein, throughout the CINC proceedings DCFS made reasonable effort to prevent the removal and reunify Ka.P. with her children. Ms. Owenwald-Dumaine testified that she made several referrals for services, including Florida Parishes Human Services Authority for substance abuse, parent classes, FPC, psychological evaluations, and the Star Transit, low cost transportation offered by the parish, for her to be able to attend her scheduled meetings. After several referrals were made

12

to FPC, she attended parenting classes in April 2025. Over 16 months had elapsed between K.P. and S.P.'s removal and the trial date, and although she maintained sobriety and obtained a license, no one relayed that she had shown improvement in her behavior. As M.P. stated, "being sober does not mean that you are able to provide a safe, stable home for children." We find this argument without merit.

As to Ka.P.'s argument that the trial court erred in finding there was no reasonable probability of continued improvement in the near future. As stated above, over 16 months passed for a substantial compliance with the Case Plan. While all the witnesses commended Ka.P. for completing some items on the Case Plan, Ms. Owenwald-Dumaine, M.P., Ms. Simms, nor Ms. Stanton believed there was *no* reasonable probability of improvement in the near future. Furthermore, all of the witnesses believed the children were thriving with their paternal grandparents and it was in the best interest of K.P. and S.P. to remain in their environment. Under these circumstances, we find no manifest error in the trial court's finding that there is no reasonable expectation of significant improvement in her condition or conduct in the near future pursuant to La. Ch. C. art. 1015(5). This argument is without merit.

Finally, Ka.P. avers the trial court erred in terminating her parental rights pursuant to her failure to pay parental contributions. Ka.P. was cognizant of court approved Case Plans that required monthly parental contributions to DCFS in the amount of $25.00 per child, per month. According to Ms. Owenwald-Dumaine and Ms. Simms, Ka.P. never attempted to make a payment to provide financial support for K.P. and S.P. Further, Ka.P. admitted that she did not pay parental contributions, and explained that she used her money to pay for oral surgery, resolve her driver's license issues, and install new flooring. Ka.P. did not provide any evidence as to her inability to make payments once she was employed, nor did she seem remorseful. Abandonment may be proven by establishing by failing the parent's failure to provide significant contributions to the children's care and support for any

consecutive six-month period. La. Ch. Code art. 1015(4)(b); *See State in Int. of K.C.N.*, 2025-0167 (La. App. 1 Cir. 12/09/25), 2025 WL 3536125, *4; *See also State in Int. of S.F.*, 2023-1269 (La. App. 1 Cir. 04/19/24), 390 So. 3d 363, 375-76. We find this argument without merit.

The record indicates that DCFS directed Ka.P. toward the appropriate agencies to assist her in meeting her responsibilities and removing the impediments to achieving the Case Plan goal of reunification. Despite these efforts of DCFS, Ka.P. failed to substantially comply with the Case Plan. While completing some items on the Case Plan, Ka.P. failed to show a change in her behavior. The trial court found that it was in the children's best interest for parental rights to be terminated considering Ka.P.'s DCFS history, DCFS involvement, and lack of maintained stability. After a review of the record, we find a reasonable factual basis exists for the trial court's findings. *See State ex rel. K.G.*, 841 So. 2d at 762 (La. 03/18/03). We find no manifest error in the trial court's judgment terminating Ka.P.'s parental rights.

## CONCLUSION

For the foregoing reasons, the trial court's December 10, 2025 judgment terminating the parental rights of Ka.P. and certifying S.P. and K.P. for adoption is affirmed. Costs of this appeal are assessed to the appellant, Ka.P.

**AFFIRMED.**